FIRST STATE BANK, TEMPLE, TEXAS, v. THE METROPOLITAN
CASUALTY INSURANCE COMPANY OF NEW YORK.

No. 6471.   Decided March 13, 1935.
Rehearing overruled April 24, 1935.
(79 S. W., 2d Series, 835.)

*Winbourn Pearce, Sam D. Snodgrass* and *Walker Saulsbury, Maurice Cheek,* former assistant Atty. gen., all of Temple, for plaintiff in error.

On proposition that act of bank directors was a guise to misappropriate funds for the bank and that insurance company was liable on its bond: San Antonio St. Ry. Co. v. Adams, 87 Texas, 125, 26 S. W., 1040; Maresh v. Jennings, 38 S. W. (2d) 406; National Surety Co. v. First State Bank of Tom Ball, 244 S. W., 217; 14a C. J., 92, 101, 377.

*Houston & Johnson,* of Dallas, for defendant in error.

On proposition that the bank sustained no loss on the act of Moore, Maresh and Carson while acting as officers and employees of the bank, but that the money went out of bank by an act of the directors of the bank, and there could be no recovery on the bond which did not purport to indemnify the bank against the bad faith of its own directors: Citizens Guar. St. Bank of Hutchins v. National Sur. Co. (Com. App.), 258 S. W., 468; Seale v. Baker, 70 Texas, 283; 6 Fletcher Cyc. Corp., 6109; 14 C. J., 815.

*Allen Wight,* of Temple, filed argument as amicus curiae.

MR. JUSTICE SHARP delivered the opinion of the court.

The First State Bank of Temple filed this suit against the Metropolitan Casualty Insurance Company of New York upon a contract of insurance protecting the bank against loss through dishonesty on the part of any employe of the bank. Judgment of the trial court was in favor of the bank and against The Metropolitan Casualty Insurance Company of New York for $22,000.00. Both parties appealed to the Court of Civil Appeals at Austin, and the judgment of the trial court was reversed, and judgment rendered in favor of The Metropolitan Casualty Insurance Company of New York. 54 S. W. (2d) 358. A writ of error was granted upon the application of the First State Bank.

Since the Court of Civil Appeals reversed and rendered this case, we think it necessary to make the following statement relating to the controlling issues raised by the pleading and evidence. Plaintiff in error alleged in substance that on or about February 14, 1928, the president, vice president, and cashier, its active officers in full control of its affairs, acting and conspiring to act under a prior scheme to take its funds, either conspiring among themselves or in collusion with other members of its board of directors, caused a dividend resolution to be spread upon the minutes of the bank, purporting to declare a dividend of $30,000.00, ten per cent of which was passed to the bank's surplus, and the other $27,-

000.00 was used to pay their individual debts; that prior thereto the six directors who claimed to have passed the alleged dividend resolution, including the president, vice president, and cashier, who were the officers covered by the policy sued on, were indebted to plaintiff in error in the sum of $22,000.00; that the named officers, together with other members of the board of directors, who were likewise indebted to the bank, agreed among themselves that they would pay their several indebtednesses to the bank, and would immediately repay themselves out of the moneys of plaintiff in error passed to their credit under the guise of a dividend.

It was also alleged that such scheme was carried to fulfillment; that the dividend resolution was not in good faith passed by its board of directors with the intention of disbursing its funds to its stockholders in proportion to stock owned, but its said named officers, in collusion with others, caused the resolution to be recorded in its minutes in furtherance of their scheme to take its moneys and to conceal from those interested the true facts relating to the misapplication; that the dividend was not paid to the stockholders in proportion to stock owned, and that such misapplication actually occurred before the pretended dividend resolution was caused to be recorded on its books. That at the time of such misapplication, plaintiff in error had been in operation less than seventy days, its capital stock was $50,000.00, and that it had not accumulated profits aggregating the amount of the dividend, nor even approaching that figure. It was further alleged that part of its original capital stock was wrongfully taken and misappropriated, and that the officers and board acted in bad faith in passing the resolution, and that the dividend issued was unauthorized, and that the officers and directors favored themselves over other stockholders of plaintiff in error.

Wm. Maresh, one of the insured employes, and vice president and director of plaintiff in error, testified:

"We did not agree originally when we first started this bank that Mr. Moore, Mr. Carson, Mr. Heard, Henry Blum and I, all of those that took stock in the new bank, that were stockholders in the old bank, would have to pay their stock assessments to the bank and turn right around and take the money out of the bank, placing to the credit of the surplus of the bank ten per cent. of what we had paid in. We didn't intend to pay anything. The bank was broke and we had no intention of paying any assessment, and we finally paid because counsel advised us to pay to make it legal. * * * He said

it would be advisable because we were making the others pay. * * * Mr. Moore, Mr. Carson and I, and the other stockholders in the new bank who were stockholders in the old bank, agreed that we would pay our stock assessment but that we would turn right around after we had paid it and take the money out of the bank, and that's what we did, in the way of dividends."

C. C. Carson, one of the insured employes, and cashier and director of plaintiff in error, testified:

"The board of directors passed that resolution declaring a $30,000.00 dividend on February 14, 1928. I did not hear Mr. Heard testify that they didn't declare that dividend on February 14. As for its being his recollection that they declared it about the 21st, will state that it could possibly have been the 21st. My minute book does not show that we had a meeting on the 21st. I know the $30,000.00 dividend was declared sometime between February 14th and 21st. We did declare a dividend and a quorum was present. I say we declared a dividend of $30,000.00 sometime between February 14th and 21st, but I can't tell you the hour. At any rate, I kept the minutes. Whenever the declaration of that $30,000.00 dividend was made, it was the most important thing the board of directors did at that meeting. As to whether I meant to tell the jury, as keeper of the records of what the board did, that I forgot to write that into the records when I was writing up the minutes for the signature of the president and myself as secretary, will state that the president did not sign this until the next morning and it may be possible that I had lots of other things to do and did overlook it. It is pretty clear that this piece of paper that this dividend is written on was pasted in there after Mr. Moore signed it, but what difference does that make? My judgment now is that this piece of paper was never pasted into this record until after Ely Moore signed these minutes, and Ely Moore didn't do that until after the 13th of March, 1928. I am of the opinion that Mr. Moore wrote it. I don't remember writing and sticking that on there. All that means is that the board of directors met on the 14th of February, 1928, and passed a resolution declaring a $30,000.00 dividend, and it seems that I forgot to write it in the minutes. All I had to write was that one page. It looks like I forgot that they had declared the dividend.

"On the 11th day of February, 1928, I sent $4,000.00 to the bank down at Austin. That was three days before they declared the dividend. I don't remember whether I sent the bank at Austin that money in furtherance of the dividend or

for money we borrowed from Hammersmith. It is possibly true that the Hammersmith money was $5,000.00 and shows as a credit on the note. As to what business I had taking $4,-000.00 out of the bank and sending it down to Austin and applying it on those joint notes that the bank didn't owe, before the directors ever told me to do it, will state that I had no authority except under the direction of the directors. They did not give me any direction until the 14th day of February. They didn't have the money until the 14th. I possibly sent it on the 11th. It bears the date of the 11th."

W. F. Blum, Jr., one of the stockholders of plaintiff in error, testified:

"I didn't get any part of the $30,000.00 dividend that was declared by this bank in the spring of 1928 and I didn't know any dividend was declared. I didn't know it until sometime later when Mr. Wade bought the bank. I was trying to locate my stock and in looking through the books, I found this dividend resolution. I expect that was about a couple of years ago. That was the first information I had about any $30,000.00 dividend. I also found on the books down there where they declared $11,000.00 dividend. I haven't got any part of that yet. I first heard about that when I was hunting for my stock. On February 14th and March 13th, 1928, and after that for months, I owned this $5,000.00 worth of stock in First State Bank. It was a $50,000.00 bank and I owned 1/10 of it. I would be entitled to 1/10 of the $27,000.00. I also owned that same stock on March 13, 1928, when they declared a dividend of $9,900.00, and 1/10 of that would be $990.00. I didn't get any of that and didn't know anything about it."

W. W. Jennings testified:

"I was a director of this bank on February 14, 1928, at which time the Minute Book of First State Bank shows a dividend resolution was passed by the board of directors of that bank. I was not present in the bank or any other place when any such dividend was ever declared by the board of directors. It was a considerable time after that when I first heard that the minutes of the bank showed there had been such a dividend declared. It would be hard to tell how long afterwards, but it was several months afterwards. This shows to be February 14, 1928, and I remember the fact that Mr. Jarrell, Mr. Blum and I filed a suit against Mr. Maresh on some of those stock notes, and that that case was tried here in this courthouse sometime last year. The case was tried about a year ago. It was shortly before that trial that I first

heard of any $30,000.00 dividend being declared. I got the news and began to work to find out about the dividend and other things in the bank. * * * I never received any part of that $27,000.00 dividend that I know of. I received no check and I received no money and I didn't receive credit on my account up there at the bank for any part of that dividend."

B. H. Wooten, a departmental examiner for the State Bank Department, testified:

"In connection with the closing of the old bank and the organization of the new bank, the Banking Commissioner of Texas levied a stock assessment against the stockholders of the old bank. The paper handed me is an official levy of assessment by the Banking Commissioner. That's an official levy of stock assessment by the Banking Commissioner.

* * * * *

"The purpose of the levy of the stock assessment against the stockholders of the old bank was to take care of bad assets in the bank. The banking commission would not have had authority to levy a stock assessment against some of the stockholders of the bank and not all of them."

In a letter dated May 10, 1928, written by B. H. Wooten, departmental examiner, to the Board of Directors of the First State Bank, is the following:

"The examiner reports you have paid a dividend from the collection of the stockholders' assessment, being $37,000.00, all of which has been collected and paid since December 17th, 1927. We are indeed disappointed in you as a Board of Directors, and especially it is hard for us to understand in view of the losses now in your bank, and your extended condition. If you had held the $37,000.00, your bank would have been in fair shape. As it is now we consider it extremely hazardous as shown in the criticism on page 12."

The policy upon which suit was filed contains the following provisions:

" 'Dishonesty' includes wrongful abstraction, misapplication or mis-appropriation and/or any other dishonest, fraudulent or criminal act, whenever committed and whether done by the employe directly *or in collusion and connivance with others*. That in case a loss is shown to be due to one or more of a group of employes, it shall not be necessary to designate the specific employe causing the loss, but the aggregate liability of the underwriter for any such loss shall not exceed the amount of insurance on one employe. The term 'employe' embraces all officers and employes, except inactive vice-presidents and directors other than officers." (Italics ours).

The trial court made the following findings:

"It further appears to the court, and the court here finds, that the undisputed evidence is that E. W. Moore, Wm. Maresh, A. J. Jarrell, T. H. Heard, C. C. Carson and H. F. Blum were stockholders in the First State Bank of Temple, which became insolvent and was liquidated by the Banking Commissioner of Texas on or about December 17, 1927, and, as such, they became indebted to plaintiff bank in the aggregate sum of $22,-000.00, under and by virtue of stock assessment levied against them by said Commissioner; that said named parties were also stockholders in plaintiff bank, and that each owned the number of shares therein as is set forth in Plaintiff's First Amended Petition herein filed; that from the date of the organization of plaintiff bank, and until March 2, 1928, said named parties, together with W. W. Jennings, composed plaintiff's Board of Directors, and during all of which time plaintiff bank was under the control and management of said E. W. Moore, Wm. Maresh and C. C. Carson, as president, vice-president and cashier, respectively. At about the time plaintiff bank was organized, the said E. W. Moore, Wm. Maresh, C. C. Carson, A. J. Jarrell, T. H. Heard and H. F. Blum agreed among and between themselves that if they should be required to pay their respective stock assessments to plaintiff bank, they would, through the guise of a dividend, repay to themselves all they were required to pay into plaintiff bank in satisfaction of said stock assessment claim; that on, to-wit, February 14, 1928, said parties did pay to the plaintiff bank the aggregate sum of $22,000.00, in cash, in full satisfaction of its said claim against them as stockholders of the old bank, and that a short time thereafter, and on, to-wit, said February 21, 1928, pursuant to the plan and scheme theretofore agreed to, said parties, through the guise of a dividend which they themselves, as plaintiff's board of Directors, pretended to declare and have spread upon the minutes of plaintiff's books, did take from the possession of plaintiff bank $22,000.00, in cash, of its funds and did appropriate the same to their own use and benefit, and of said sum E. W. Moore received $9800.00, Wm. Maresh received $6700.00, A. J. Jarrell received $1200.00, C. C. Carson received $1700.00, T. H. Heard received $1600.00, and H. F. Blum received $1000.00."

It further appears that on December 17, 1927, The First State Bank was liquidated and dissolved, and plaintiff in error was duly organized and succeeded to all the rights of such old bank in every respect; and the insurance policy issued by de-

fendant in error for the old bank was continued in force for plaintiff in error.

The trial court entered judgment as above indicated, in favor of the bank and against the insurance company, for $22,000.00, and also that nothing be recovered against Maresh, Jarrell, the Blums, Jennings, Carson, and Heard, the other defendants.

The Court of Civil Appeals, in construing the policy involved here, held:

"The policy only purported to indemnify the bank against the dishonesty of its employees, acting in their capacity as employees, and not against acts on their part in carrying out the instructions of the board of directors arrived at in a regular meeting, however improvident or unauthorized that action of the board might be. When taken by the board in its official capacity as such, the action then becomes that of the bank, and without the terms of the policy."

1 In the light of the foregoing statements the holding of the Court of Civil Appeals is contrary to the decisions of this court in many cases. Unless it can be said as a matter of law that there was no evidence of probative force to sustain the findings of the trial court, the Court of Civil Appeals was not justified in reversing and rendering the cause. It can become a question of law only when the facts and circumstances are such that but one reasonable conclusion can be drawn therefrom. If the Court of Civil Appeals undertook to substitute its findings of fact for the findings made by the trial court, and render final judgment thereon, it would not be authorized to do so, if there was any evidence in the record to sustain the findings made by the trial court. National Bond & Mortgage Co. v. Davis (Tex. Com. App.), 60 S.W. (2d) 429, 432; Galveston H. & S. A. Ry. Co. v. American Grocery Co., 122 Texas, 1, 7, 13, 36 S. W. (2d) 985, 990.

2 Plaintiff in error is a creature of our State laws. Title 16, Chapters 1 to 9, inclusive, Revised Civil Statutes of Texas. Banks occupy an important position in our business affairs. The officers and directors control the operation of a bank. The directors are trustees, and their acts with respect to the property of the bank are controlled by the principles of law governing other trustees. 6 Tex. Jur., 189, 190; 14a C. J., 97, 98, 99. The law exacts of those who manage the affairs of a bank obedience to certain fundamental principles or rules. They owe a high duty to the general public and stockholders. The

directors and officers owe to the bank scrupulous good faith in the performance of the duties which they have assumed, and they should discharge those duties with prudence and good faith, and with ordinary care and diligence. Seale v. Baker, 70 Texas, 283, 8 Am. St. Rep., 592, 604, 7 S. W., 742; Minor v. The Mechanics' Bank, 1 Pet., 46-88, 26 U. S., 38, 7 L. Ed. 47; McShane v. Howard Bank, 73 Md., 152, 10 L. R. A., 556, 20 Atl., 779; Phillips v. Bossard, 35 Fed., 100; 7 C. J., Sec. 169, p. 563, and authorities cited in foot note.

In the case of Seale v. Baker, supra, in discussing the duties of directors of banking corporations, it was said:

"They have important duties to perform toward its creditors, customers and stockholders, all of whom have the right to expect that these duties will be performed with diligence and fidelity, and that the capital of the corporation will thus be protected against misappropriation and diversion from the legitimate purposes of the corporation."

The statutes controlling the operations of State banks unequivocally state what the officers of a bank may do and may not do. Article 507 provides, in part:

1. "No bank or bank and trust company or any member of either, during the time it shall continue its operations, shall withdraw or permit to be withdrawn any part of its capital, either in the form of dividends or otherwise."

2. "No dividend shall ever be made by such bank while it continues its operations, to an amount greater than its net profits then on hand, deducting therefrom its losses and bad debts."

3. "The board of directors of any such bank may declare a semi-annual or quarterly dividend if such dividend has been earned, if the corporation be fully solvent without such earnings proposed to be divided. But they shall not declare a dividend at any time when the capital of such corporation shall have become impaired to such an extent that it is not worth in good resources the full amount paid in after the payment of all liabilities."

Article 508 also in part provides:

"Any officer or director of such corporation who shall assent to declaring and paying dividends when the capital stock is so impaired shall be personally liable to the creditors of the corporation to the amount of his proportion of the proposed dividend, if any loss occur by reason of the payment of such dividend."

Article 544 of the Penal Code places a heavy penalty upon

"every president, cashier, director, teller, clerk, or agent of any State bank or bank and trust company incorporated under the laws of Texas, who embezzles, fraudulently abstracts or wilfully misapplies any of the moneys, funds or credits of such bank or bank and trust company."

Let us apply the foregoing principles to the issues raised in this case. It is contended that the dividend was declared by a vote of the directors spread upon the minutes of the bank, and that if the payment of the dividend was a misappropriation of the funds or assets of the bank, it was the act of the directors of the bank, and not of the employes, as stipulated in the insurance policy; and, therefore, there is no liability on the party of the insurance company. The purpose of the policy was to protect the bank from the dishonesty of its employes, described therein. That instrument describes the terms under which the company undertook to bind itself, in the following language:

" 'Dishonesty' includes wrongful abstraction, misapplication or misappropriation and/or any other dishonest, fraudulent or criminal act, whenever committed and whether done by the employe directly *or in collusion and connivance with others.*" (Italics ours).

3 In construing the contract before us we recognize the general rule that the obligation of a surety is to be strictly construed, and that the surety has the right to stand upon the letter of his contract. However, the policy constituting the contract must be given such a construction as to carry out the purposes for which it was executed and the intention of the parties thereto. Besides, Article 498 of the Statutes provides that,

"All * * * officers and employes of State banking institutions whose duties permit or require the handling of any of the funds of the bank shall * * * give a good and sufficient bond * * * conditioned for the faithful performance of their duties and such pecuniary loss as the bank may sustain for money or other valuable securities embezzled, wrongfully abstracted or willfully misapplied by any such officer or employe. * * *"

The great object of the law is to protect from misapplication for improper purposes the assets of banks. The lawmakers have measured in plain terms certain restrictions with respect to the management of banks by their officers and directors. The law requires a good and sufficient bond. Therefore, the bond in question should be construed in connection with the statutes before us, in order to arrive at the purposes for which it was executed. Furthermore, it is a fidelity bond, and will be

given a more liberal construction than a contract which involves only the pure question of the rights and obligations of a surety. Couch's Cyclopedia of Insurance Law, Vol. 5, Sec. 1199a, pp. 4324 et seq., and authorities cited.

The historic case of Minor v. The Mechanics' Bank, supra, involved a suit on a bond given by the cashier, conditioned that the cashier would well and truly execute the duties of his position. The bondsmen defended on the ground that the loss suffered by the bank and the failure of the cashier in the performance of his duties were caused by the connivance and permission of the board of directors. The Supreme Court of the United States, in a noted opinion, speaking through Mr. Justice Story, said:

"Upon deliberate consideration, we are of opinion that the pleas on which these issues are founded are substantially bad. They set up a defense for the cashier that his omission 'well and truly to perform' the duties of cashier was by the wrong, connivance, and permission of the board of directors. The question then comes to this, whether any act or vote of the board of directors, in violation of their own duties and in fraud of the rights and interest of the stockholders of the bank, could amount to a justification of the cashier, who was a *particeps criminis*.

"We are of opinion that it could not. However broad and general the powers of the direction may be for the government and management of the concerns of the bank, by the general language of the charter and by-laws, those powers are not unlimited, but must receive a rational exposition. It cannot be pretended that the board could, by a vote, authorize the cashier to plunder the funds of the bank, or to cheat the stockholders of their interest therein. No vote could authorize the directors to divide among themselves the capital stock, or justify the officers of the bank in an avowed embezzlement of its funds. The cases put are strong, but they demonstrate the principle only in a more forcible manner. Every act of fraud, every known departure from duty, by the board, in connivance with the cashier, for the plain purpose of sacrificing the interest of the stockholders, though less reprehensible in morals or less pernicious in its effects than the cases supposed, would still be an excess of power, from its illegality, and, as such, void as an authority to protect the cashier in his wrongful compliance. Now, the very form of these pleas sets up the wrong and connivance of the board as a justification; and such wrong and connivance can

not for a moment be admitted as an excuse for the misapplication of the funds of the bank by the cashier."

The principles announced in the foregoing opinion have been followed by many courts of this country.

The trial court found that E. W. Moore, Wm. Maresh, A. J. Jarrell, T. H. Heard, C. C. Carson, and H. F. Blum were stockholders in the old First State Bank, which became insolvent and was liquidated by the Banking Commissioner of Texas, and that they became indebted to plaintiff in error in the aggregate sum of $22,000.00 by virtue of a stock assessment levied by the Commissioner; that they were also stockholders in plaintiff in error, and that they and W. W. Jennings composed the board of directors of plaintiff in error, and that the bank was under the control and management of Moore, Maresh, and C. C. Carson, as president, vice president, and cashier, respectively; that all of the parties except Jennings agreed that if they should be required to pay their respective stock assessments to plaintiff in error, they would, through the guise of a dividend, repay to themselves all they were required to pay plaintiff in error, in satisfaction of the stock assessment claimed. The court further found that the parties did pay to plaintiff in error the sum of $22,000.00, and concluded his findings in the following language:

"And that a short time thereafter, * * * pursuant to the plan and scheme theretofore agreed to, said parties, through the guise of a dividend which they themselves, as plaintiff's Board of Directors, pretended to declare and have spread upon the minutes of plaintiff's books, did take from the possession of plaintiff bank $22,000.00, in cash, of its funds and did appropriate the same to their own use and benefit, * * *"

4  The issue was raised that the directors did not act in good faith in the issuance of the dividend; that it was not declared in conformity with law, and was done for the purpose of evading the payment of the assessments made by the Banking Commissioner in the liquidation of the old insolvent bank of which they were stockholders; that the directors connived with each other in declaring the dividend, and it was not done for the benefit of plaintiff in error or of its stockholders. If the officers and directors of the bank, who were employes as described in the policy, acting in bad faith, united and connived in abstracting, misapplying, or misappropriating its funds and assets, and to accomplish this purpose declared the dividend in the manner described above, and obtained the moneys of the bank for their own personal use, their acts did not become the acts of the

bank itself, and the insurance company was liable for their misdeeds under the terms of the bond.

5 · The pleadings and evidence raised certain issues of fact to be determined. The trial court made certain findings; and can it be said, as a matter of law, that there is no room for a difference of opinion as to the issues determined by the trial court? If there is room for a difference of opinion· upon these questions, the Court of Civil Appeals erred in reversing and rendering the cause. In construing the controverted issues of fact, it is our duty to accept as true that testimony which tends to support the findings of the trial court. We think the evidence fully sustains those findings.

The judgment of the Court of Civil Appeals will be reversed, and the judgment of the trial court affirmed.

Opinion delivered March 13, 1935.

Rehearing overruled April 24, 1935.