INTERNATIONAL–GREAT NORTHERN R. CO. v. SINGER IRON & STEEL CO.

No. 10200.

Court of Civil Appeals of Texas. Galveston.

May 21, 1936.

Rehearing Denied Oct. 8, 1936.

Andrews, Kelley, Kurth & Campbell, Walter F. Woodul, and Ernest H. Folk, all of Houston, for appellant.

Maurice Epstein, of Houston, for appellee.

GRAVES, Justice.

The appellant, as plaintiff, sued the appellee, as defendant, below for demurrage on in-coming cars of scrap iron shipped over the former's lines to the latter at the Port of Houston, and which had been held by the railroad while awaiting instructions from the steel company or which had not been unloaded by the latter within the allowed free time; the only question involved there or here is, which one of two separate demurrage-tariffs, that is, the local one known as American Railway Association Freight Tariff, T. B. Jones, agent, the other, which is applicable only to export shipments originally billed or declared for export "provided delivery is made direct from cars to shipside," known as Texas Lines Tariff, A. C. Fonda, agent, applies; the problem as to which of these tariffs should be applied is in turn solvable by whether or not, under the peculiar facts here obtaining, the yard of the steel company is located at "shipside," as that term is used in the applicable demurrage tariffs; appellant contended there and still does here that the regular domestic tariff applied, while the appellee insisted that the export rate applied, they agreeing that if appellant was right there was due it $2,066, whereas only $308 was due it if the appellee was right.

The learned trial court, before whom the cause was tried without a jury, took the view that the export rate applied, and accordingly gave the appellant judgment for the agreed $308 in that contingency, supporting its conclusion by these findings of fact and law:

"Findings of Fact.

"I. It is admitted by the parties, by agreement in open court, that if export demurrage rates apply on all the cars involved in the suit, then defendant is indebted to plaintiff in the sum of $308, but if domestic demurrage rates apply on all cars involved, then defendant is indebted to plaintiff in the sum of $2,066.

"II. It is admitted that defendant tendered into court the sum of $308.

"III. Defendant has been engaged in the business of exporting scrap iron and steel in the city of Houston, Tex., since the latter part of the year 1919, and during all that time its place of business and yards have been at and behind dock or wharf 3, at and behind dock or wharf 10, and at and behind wharf site No. 9, its present location. These wharves or docks are public wharves, under the control of Houston Navigation District.

"IV. Defendant's scrap iron, or shipments involved in this suit, are unloaded from the cars and held in defendant's yard pending arrival of boats or accumulation of cargo.

"V. The several grades of iron on arrival are unloaded from the cars in defendant's yard, and each grade is kept separate.

"VI. The identical scrap iron which is unloaded from the cars is subsequently loaded into the ships for export, except that in some few instances (about 1 per cent.) whenever any of the scrap iron is so bulky or irregular in shape as to make it difficult of accommodation into the ship's berth, the same is reduced in size by cutting so as to facilitate the loading of the ship.

"VII. Nothing is done to the iron, for the purpose of changing its grade, or class, or for the purpose of sale, and the iron is handled solely for the purpose of facilitating loading in a steamer.

"VIII. Before loading into steamers, defendant's scrap iron must be weighed by the railroad company, and the defendant pays the railroad company a charge for this service.

"IX. The scales of the railroad company are located some distance from defendant's yards, that is in the 'North Yard,' and for that reason it is necessary for defendant, before loading the scrap iron into ships, to switch the cars to defendant's 'North Yard.' For this switching service defendant pays the railroad company a switching charge, in addition to the weighing charge. Defendant's yard, as well as the 'North Yard' are all within the 'Port' limits of area, officially known as the 'Navigation District of the Port of Houston.'

"X. After the cars have been switched to the 'North Yard' for weighing, they are then switched to the particular wharf or dock at which the particular boat, into which the scrap iron is to be loaded, is berthed.

"XI. When defendant's yards were located adjacent to wharf 10, its scrap iron was handled in the identical manner as at its present location, and according to the customs and practices of the Port regarded as a 'shipside' location.

"XII. When defendant's yards were located adjacent to dock or wharf 3, its material was handled in the same manner as at its present location, and according to the customs and practices of the port, regarded as a 'shipside' location.

"XIII. When defendant's yards were located adjacent to dock or wharf 3, the material was dumped on the ground in front—on the apron of the wharf—and when the actual wharf area became filled with defendant's material, defendant was permitted to unload the material behind wharf 4, something like 1,400 or 2,000 feet away from the dock; the amount of ground behind the wharf used by defendant depending upon the amount of scrap iron on hand at any particular time, and whether a ship was available.

"XIV. When defendant was located adjacent to dock or wharf 3, its material, when ready, preparatory to loading into ships, was reloaded into cars and weighed. The material was taken out or switched from the yards by the Port Terminal Railroad Company to the place where the scales were located, and then brought all the way back, sometimes back behind docks one and two until it reached No. 3, and sometimes in the opposite direction depending upon which was convenient to the railroad company.

"XV. When defendant was located adjacent to dock or wharf 10, it unloaded or stored its material, awaiting the arrival of a ship, alongside of the apron of the wharf, and what could not be accommodated was stored on the solid ground behind the wharf, and on the solid ground behind the tracks on the land side, extending back and away from the wharf a distance of approximately 600 to 700 feet.

"XVI. When defendant was located at wharf 10, even the material that was actually placed on the wharf was, prior to the loading into ships, loaded into cars, switched to the north yard for weighing, and brought back to dock or wharf 10, and set alongside the ship.

"XVII. In certain instances, where defendant's stevedores attempted to use the crane to switch cars down to the ship when defendant was located at wharf 10, the Port Commission objected and took the position that their engines had to make every move, even if it was only ten feet, as required by proper practice of the port.

"XVIII. The early part of 1929, wharf No. 10 began to sink, because of the weight of defendant's material, and defendant was moved, by direction of the Port Commission, to its present location designated as wharf site 9.

"XIX. There is no wharf for loading purposes at wharf 9, the present location of defendant. The Port Commission, however, contemplates the construction of a wharf there at sometime in the future.

"XX. Defendant's present location is about 205 feet from the water's edge.

"XXI. In connection with its present location, defendant has been principally us-

ing wharf 10, which is the nearest wharf, and about 125 feet from defendant's yards.

"XXII. Defendant uses other wharves, depending upon where the ship may be berthed for loading.

"XXIII. In the use of these wharves, a wharfage charge is made by the Port Commission to all parties using them, and no one has any exclusive right to the wharf, even if the wharf is located immediately in front of a party's property.

"XXIV. All of defendant's material is bought for export, billed or declared for export, and actually exported.

"XXV. Because of the great weight of defendant's material, the reloading into cars is the only practical way defendant has of actually getting its material to the ship from its present location.

"XXVI. According to the customs and practices of the port, the yards of defendant are considered a 'shipside' location. These yards are leased by defendant from the Port Commission.

"XXVII. According to the practices and customs of the port, the method and manner in which the defendant has been handling the scrap iron in its yards, and extending over a period of more than twelve years, has at all times been considered a 'shipside' practice, and not affecting the export character of the scrap iron.

"XXVIII. According to the practices and customs of the port, the yards or ground adjacent to a wharf are considered part of the wharf property.

"XXIX. Switching movements from defendant's yards to the North Yard for weighing, and then to boat for loading, are all within the port area, and are, according to the practices of the port, recognized as intraplant movements.

"XXX. Defendant was required to move its location from wharf 10 to its present location, because the superimposed weight of scrap iron on wharf No. 10 caused the wharf to sink, and to avoid the complete destruction of the wharf, the Port Commission required defendant to remove the scrap iron loaded on the wharf, and thereafter defendant was assigned, by the Port Commission, to its present location, which is in the rear of wharf site No. 9.

"XXXI. Defendant's freight and method of handling in its yards has always in the past, and covering a number of years and during the whole life of the Port of Houston, been recognized by the port as 'shipside' consignment of freight, and it was always during the life of the port so recognized by the head of the Freight Bureau making the local freight demurrage rates, until this dispute arose, and even now a portion of the railroads, feeders to the port of this class of freight, including the M. K. & T. and Southern Pacific Lines, have always taken the position, and still do, that the scrap iron as handled in the instant case should be considered as shipside freight, for the purpose of fixing demurrage charges, and no railroad contended otherwise until this controversy arose.

"XXXII. About 1 per cent. of the scrap iron handled through the yards of the defendant is cut up to better facilitate shipping, this cutting process having no bearing upon the classification of the scrap iron. The great bulk of the scrap iron received by the defendant does not have to be assorted in unloading from the cars to the yards or boat, and usually and customarily, as received from the railroads, the scrap iron is all of one particular classification; but that a small per cent., not to exceed 1 per cent. of such scrap iron was assorted and classified in the process of unloading from cars in the yards of the defendant.

"Conclusions of Law.

"I. Section 3 of Supplement No. 17, Texas Lines Tariff, No. 25–F, showing demurrage and storage rules applicable to the Houston Port on the cars involved in this suit, specifically provides in Note 2 that 'the term "shipside" as used herein means *the placement for delivery to,* or receipt from ships, barges, or other craft *according to the customs or practice of the port.*' (Italics mine.)

"Being of the opinion that the evidence conclusively shows that defendant's yards and location, according to the customs and practices of the port, is in fact a 'shipside' location, and that the freight involved in this suit, as well as defendant's handling thereof, according to the customs and practices of the port covering a number of years, and during the whole life of the Port of Houston, has always been recognized by the port as 'shipside' consignment of freight, I conclude that the freight involved should be classed as export 'shipside' freight for the purpose of fixing demurrage charges, and should not be treat-

ed as local or domestic freight as contended by the plaintiff.

"II. I find that the demurrage rules under Texas Lines Tariff No. 25–F, should apply, and that the defendant is indebted to plaintiff only in the sum of $308, which amount it has heretofore tendered, and judgment should, accordingly, be rendered in favor of the plaintiff for the sum of $308, and all costs should be taxed against plaintiff. * * *

"Additional Findings of Fact Requested.

"I. The Port Terminal is a switching company operated jointly by the carriers serving Houston. It performs as agent switching services within the port limits of Houston which the I–GN individually holds itself out to perform. Its rails reach and it thus serves, among other industries within port limits, the scrapyard of the defendant, Singer Iron & Steel Company.

"II. From the nearest railroad track of the defendant Singer Iron & Steel Company's yard to the shore line of the Houston Turning Basin is a distance of 205 feet and such track of defendant is located on a bluff 38.5 feet above water in the turning basin, as shown by Exhibit No. 2. No wharf has been constructed from this specific frontage as yet and no vessels berth at that point for the receipt or discharge of cargo, such location being known as Wharf Blank 9.

"III. The nearest part of the defendant, Singer Iron & Steel Company's yard to the shore line of the Houston Turning Basin is 149 feet and it is 37.7 feet above the water in the turning basin.

"IV. To move a car of scrap iron loaded in the southeastern end of the yard of defendant by the nearest direct track to the nearest wharf would involve a 2,800-foot movement. * * *

"IX. All of the scrap iron involved in this suit was delivered to the Singer Iron & Steel Company in its yards and Singer Iron & Steel Company had complete control and dominion over such scrap iron, with full power and right to do whatever said Singer Iron & Steel Company chose to do with said scrap iron and the services of the I–GN with respect to each shipment was actually terminated upon the placement of such cars of scrap iron in the Singer Iron & Steel Company's yards. Such cars containing scrap iron once so delivered were moved around in the yards of the Singer Iron & Steel Company by their own motive power in order to put different classes of scrap iron in different lots or piles. Such scrap iron was in the possession of the Singer Iron & Steel Company to do with as it would, in their possession without the control of the carrier, to hold in its yards for such length of time as it deemed desirable.

"Chas. E. Ashe, Judge of the 11th District Court, Harris County, Texas."

■ None of the quoted findings are attacked as being without sufficient support in the evidence, nor could they successfully have been, since an examination of the statement of facts discloses ample support of them all; wherefore, they are binding upon this court. Texas & P. Ry. Co. v. City of El Paso (Tex.Sup.) 85 S.W. (2d) 245; First State Bank v. Metropolitan Casualty Ins. Co., 125 Tex. 113, 79 S.W. (2d) 835, 98 A.L.R. 256; East Texas Refining Co. v. Helver Oil Co. (Tex.Civ.App.) 82 S.W.(2d) 392, 395.

Indeed, appellant's sole contentions in this court are not that any of the findings were even against the preponderance of the evidence, but that:

"Proposition No. I.

"The trial court erred in holding that the yard of the appellee is located at 'shipside,' as that term is used in the applicable demurrage-tariffs, and that the export demurrage-tariffs were applicable to cars of scrap-iron held at its yard, because the uncontroverted facts, taken in connection with the definition of 'shipside'-delivery contained in the applicable demurrage-tariffs, show conclusively that its yard is not located at 'shipside' within the meaning of such tariff, and that its scrap-iron cannot be loaded from its yard to the ships, without first reloading such scrap-iron into freight cars and switching them a distance of at least 2800 feet.

"Proposition No. II.

"Even where freight is shipped directly to shipside, the export demurrage-rates do not apply, unless all of the freight is actually exported without the necessity of merchandising or grading it."

Such being the questions presented here, it is thought the learned trial court's findings and conclusions furnish complete answer within themselves; certainly appel-

lant's proposition No. II is a mere abstraction as concerns this controversy; since the trial court found on unchallenged proof that all the scrap iron in this instance was declared for and was actually exported—not only so, but that the identical iron unloaded in the appellee's yard was so subsequently exported with nothing having been done to it to change its grade or class or for the purpose of sale, and that the cutting off of an aggregate of 1 per cent. therefrom had been done solely for the purpose of facilitating the loading of the whole into the steamer.

In this connection the I. C. C. decision in Merchants & Planters Warehouse Co. v. G. H. & H. R. R. Co., relied upon by the appellant, is easily distinguishable from this cause, in that no notice had been given there that the traffic was intended for export as contemplated by the tariff, hence the complainants in that instance were evidently engaged in domestic as well as export business, whereas the established fact here is that the appellee was doing an export business only.

■ As concerns the main question appellant raises, that is, whether or not the uncontroverted facts here show conclusively that the appellee's yard is not located at "shipside," within the meaning of the demurrage tariffs here involved, this reply presented in the appellee's brief is thought to be a conclusive answer, hence is quoted with approval:

"Appellant's argument under its Proposition No. I is unsound on its face, because it persistently ignores the definition of 'shipside,' as set out in the tariff. The tariff should be read as an entirety; and Rules 32–E and 32–A, and the note set out on pages 32 and 33 of the appellant's brief should, of course, be read in conjunction with Note 2, which gives the definition of 'shipside.' Appellant's argument is founded on what undoubtedly is the literal meaning of shipside; but the tariff, which was written by appellant and its confrerees [and, therefore, should be construed most strongly against them and most favorably to the appellee, Atlantic Coast Line R. Co. v. Atlantic Bridge Co. (C.C.A.) 57 F.(2d) 654, infra] gives to the term 'shipside' as used in the tariff a special and qualified meaning, concerning which there can be no ambiguity whatsoever. It is immaterial, therefore, what the term 'shipside' may 'usually' mean. It is immaterial, further, that 'the physical fact remains that due to the location of such scrap iron on a hill 200 feet from those ships, it cannot be and is not loaded directly from the scrap yard to those ships,' if, in fact, appellee's yards, 'according to the customs and practices of the Port,' was a 'shipside' location for the placement for delivery to ships. Appellant persistently ignores the uncontradicted testimony which compelled the trial court to find as a fact that the appellee's yards, according to the customs and practices of the Port, are at 'shipside.' Appellant also ignores the fact that the unloading of the scrap-iron in appellee's yards was as physically near and close to the ships as the rules, customs, and practices of the Port permitted for this character of material, and that for this particular commodity, which requires an unusual amount of space for accumulation and which is difficult to handle, appellee's yards were, according to the customs and practices of this particular Port, designated as constituting 'shipside,' fully as much as any place directly on the wharves themselves and immediately alongside the vessel might be for the delivery or handling of a basket of flowers, or other commodity susceptible of closer handling.

"True, at this particular location the actual movement to reach the ship was 'in cars'—but this the trial court found was the only practical way in which this character of material could be conveyed. True, at this particular location, the distance from the yards to the railroad scales and then back to the ship's berth was about 2800 feet—but this, as found by the court, was simply an 'intraplant movement,' incidental to loading directly into ships, and the total distance thus traversed was in part made necessary by the fact that it was necessary for appellee, prior to loading into ships, to weigh this material on railroad scales (not its own private scales as suggested by appellant), and to move this material to whatever point such railroad scales might be located. This movement was the only practical method available to the appellee under the circumstances for loading its materials into the ship, and so long as it was all conducted within its own yards and the limits of the Port, in accordance with the requirements of the Port Authorities, (Findings of Fact Nos. 27 and 29) for the sole purpose of completing the export of material originally declared for export at its shipside yards, the actual distance traversed is unimportant, particularly when it is undisput-

ed and the court found as a fact that this 'intraplant' switching and handling were identical with the method followed by appellee when it was located at wharf Ten and Wharf Three (Findings of Fact Nos. 15 and 16). In this connection, it is significant that when appellee was located at wharf Ten, even in those instances where the material had actually been placed on the wharf itself, 'the material prior to loading into ships (was) loaded into cars, switched to the North yard for weighing, and brought back to wharf Ten and set alongside the ship,' (Finding of Fact No. 16), and in some instances this movement required switching of these cars as much as one-half mile each way."

In Atlantic Coast Line R. Co. v. Atlantic Bridge Co. (C.C.A.) 57 F.(2d) 654, 655, the court through Hutcheson, Circuit Judge, said:

"Tariffs, like statutes, must be expressed in clear and plain terms, so that those dealing with and governed by them may understand them and act advisedly. * * * If they are ambiguous, or permit of two meanings, the shipper may construe them in the most favorable way to himself which the terms permit.' Southern Pac. Co. v. Lothrop (C.C.A.) 15 F.(2d) 486; American Ry. Express Co. v. Price (C.C.A.) 54 F.(2d) 67; United States v. Gulf Ref. Co., 268 U.S. [542] 543, 45 S.Ct. 597, 69 L.Ed. 1082. * * *

"It is equally clear that a carrier may not, under a tariff couched in general terms, which, if interpreted in one way, will produce a higher, in another a lower, rate, insist upon the interpretation which gives it the higher rate. In short, in a situation of that kind, the shipper who has to pay the freight may call the tune."

Further discussion being deemed unnecessary, the judgment will be affirmed.

Affirmed.

PLEASANTS, C. J., not sitting.