C. H. LANGDEAU, Receiver of Southern Industrial Life Insurance Company and Liquidator for the State Board of Insurance, et al., Appellants,

v.

GREAT AMERICAN INSURANCE COMPANY, Appellee.

No. 11110.

Court of Civil Appeals of Texas.

Austin.

July 17, 1963.

Rehearing Denied Aug. 1, 1963.

Further Rehearing Denied Aug. 8, 1963.

John R. Grace, Kerns B. Taylor and Harold G. Kennedy, Austin, Waggoner Carr, Atty. Gen., Dudley D. McCalla, Joe R. Long, Asst. Attys. Gen., Austin, for appellants.

Brown, Sparks & Erwin, Will G. Barber, Austin, for appellee.

HUGHES, Justice.

This suit is by C. H. Langdeau in his official capacity as Receiver of Southern Life Insurance Company and as Liquidator for the State Board of Insurance and the State Board of Insurance against Great American Insurance Company of New York upon a fidelity bond executed by it in the sum of $20,000.00 whereby it became bound to pay not to exceed such sum to the "Commis-sioner of Insurance for the use and benefit of Southern Industrial Life Insurance Company" the amount of all direct losses caused by Ralph Derrell Huffman, an employee of such company, through "larceny, theft, embezzlement, forgery, misapplication, wrongful abstraction, willful misapplication, or any other act of fraud or dishonesty" committed during the term of such bond by Mr. Huffman acting directly or in collusion with others.

Southern Industrial Life Insurance Company was a Mutual Assessment Company under the Laws of Texas. Ch. 14, Texas Insurance Code, Vol. 14A, V.A.C.S.

In July 1960, Southern Industrial was adjudged delinquent and insolvent, its authority to conduct business was revoked, and its affairs were placed in receivership by the District Court of Travis County, 53rd Judicial District. Mr. C. H. Langdeau was appointed receiver and statutory liquidator and he qualified and is acting herein as such.

Art. 14.08 of Ch. 14, supra, provides, in part:

"Such association shall, by resolution adopted and entered on its minute book, a copy of which properly certified to by the president, secretary, or general manager shall be filed with the Board of Insurance Commissioners, designating therein some officer who shall be responsible in the handling of the funds of the corporation. Such association shall make and file for such officer a surety bond with a corporate surety company authorized to write surety bonds in this State, as surety, satisfactory and payable to the Board of Insurance Commissioners of Texas in the sum of not less than Two Thousand Five Hundred ($2,500.00) Dollars for the use and benefit of said association, and which shall at all times be equal to the amount of the mortuary fund on hand, not to exceed Twenty Thousand ($20,000.00) Dollars, which said bond shall obligate the principal and surety to pay such pecuniary loss as the as-

sociation shall sustain through acts of fraud, dishonesty, forgery, theft, embezzlement, wrongful abstraction or willful misapplication on the part of such officer, either directly and alone, or in the connivance with others, while employed as such officer or exercising powers of such office."

Art. 14.09 of Ch. 14, provides:

"Art. 14.09. Recovery on Bond

"When the Board is informed that any officer of any such association has violated the terms of either of said bonds it shall demand a written explanation of such officer as to such charge, and if after such explanation the Board is not satisfied as to the existing facts in controversy it shall notify such officer to be and appear in Travis County with such records, writings, and other correspondence and facts as the Board deems proper, not earlier than ten (10) days or later than fifteen (15) days from service of notice, and it shall there conduct an examination into such affair, and if upon such examination the Board shall become satisfied that the terms of said bond have been violated by said officer the Board shall immediately notify the company executing said bond and prepare a written statement covering said facts and deliver same to the Attorney General of Texas, whose duty it shall be to investigate said charges and if satisfied that the terms of said bond have been violated he shall enforce the liability against said cash or securities, or he shall file suit on said bond in the name of the Board of Insurance Commissioners of Texas for the benefit of the beneficiaries thereof against said officer as principal and the sureties of his bond for the recovery of said amounts due by said officer, and all costs of suit in some court of competent jurisdiction, in Travis County, Texas."

■ At a special meeting of the Board of Directors of Southern Industrial Life Insurance Company February 13, 1959, R. D. Huffman was elected Secretary-Treasurer, Director and principal bonded officer of the Company and he was specifically "authorized and empowered to open one or more bank accounts in the name of the Company in any bank or banks in Texas that are legal depositories for funds of such Companies and to sign such signature cards, checks, resolutions or other instruments of writing as may be required for the normal conduct of business of the Company."

Mr. R. D. Huffman signed and attested the accuracy of the minutes of the Company reflecting its actions, as stated, under the "penalties of perjury."

Mr. Huffman assumed the position of Secretary-Treasurer of the Company and as its bonded officer and accepted the accompanying responsibilities.

We will now describe the manner in which Mr. Huffman testified that he discharged his duties:

"Q Now, having taken over as secretary-treasurer and bonded officer of Southern Industrial Life Insurance Company, did you have occasion to write some checks from time to time in that company?

"A Yes, sir.

"Q Did you write all or most of the checks in that company?

"A No, sir. I signed most of the checks.

"Q How did you sign them?

"A I signed checks in blank in most instances. Possibly some bills I had before me; I paid them with the bill in front of me. * * *

"Q Did you ever look to see the source of these expenditures resulting from the blank checks that you signed—

"A No, sir, other than—

"Q —to see where the money was going?

"A No, sir, other than casually looking at a check, while I was signing it, maybe, sometime.

"Q And did you ever bother to see whether any papers were executed to support these disbursements, the blank checks that you were signing?

"A No, sir; Mr. Bridges handled all the paper work, the legal documents, the processing of all investments.

"Q You never did bother to check on that?

"A No, sir. * * *

"Q Did you see any of the mortgage loan papers in the office there, supporting those purported mortgage loans, for the year 1959 for Southern Industrial?

"A No, sir. As I said, Mr. Bridges handled the investments and all the necessary legal documents.

* * * * * *

"Q Did you attempt to make an investigation whatever of the financial affairs or bookkeeping of Southern Industrial Life Insurance Company while you were the secretary-treasurer and principal bonded officer of the company?

"A No, sir.

"Q Did you exercise any care whatever in seeing that the money that was disbursed went for authorized investment purposes under the Insurance Code?

"A I only made disbursements when I was instructed to by Mr. Bridges. As far as checking on any of those disbursements, I did not.

"Q Well, did you exercise any degree of care or responsibility with reference to determining whether the disbursements were for authorized purposes and were proper?

"A No, sir; since Mr. Bridges handled that, he took care of it.

"Q Did you ever make any attempt to recapture any of the money that went out of the company on these blank checks which you said you signed, where it went for purposes other than the insurance company, Southern Industrial?

"A Did I personally make any attempt to recover?

"Q Yes.

"A No.

"Q Did you ask anybody in the company or any of the officers or directors to make any attempt?

"A No, sir.

"Q Did you ever call to the attention of any of the officers or directors of Southern Industrial Life Insurance Company any irregularities, or the fact that you were signing all the checks in blank?

"A No, sir, I was not aware of any irregularities, either in signing checks in blank, or in anything else."

Part of Mr. Huffman's duties was to check premium receipts and to pay claims.

The record is undisputed that as a direct result of the looseness with which Mr. Huffman handled the funds of the Company that W. L. Bridges, Jr. was allowed to withdraw $277,500.00 of such funds for which the Company received nothing of value, and that this loss was never recouped.

The only excuse which Mr. Huffman offers for the manner in which he conducted the financial affairs of the Company is that he trusted Mr. Bridges who employed him. Mr. Huffman stated that he was impressed with W. L. Bridges, Jr. because he

wore tailored suits, a large diamond ring, drove a Cadillac and boasted of the amount of money he could borrow, and that he had a pleasing personality. Mr. Huffman also believed that Bridges owned the Company and could do with it as he pleased.

Mr. Huffman on February 29, 1960, joined other officers of the Company in filing with the State Board of Insurance a sworn annual statement of the Company for the year 1959 which falsely reported the financial condition of the Company.

There is no evidence that Mr. Huffman received any of the funds of the Company which were unlawfully withdrawn by W. L. Bridges, Jr.

Mr. Huffman was paid a salary of from $500 to $600 per month, one-half being paid by Southern Industrial Life and one-half by another Bridges Company. He was a 1958 graduate of the University of Texas, with a B.B.A. degree.

This case was tried to a jury which found:

1. (a) That in signing checks (totaling $265,000) and making them available to W. L. Bridges, Jr., R. D. Huffman did not commit an act of fraud or dishonesty upon the Company acting either directly and alone, or in connivance with Bridges (b) nor was he thereby guilty of such reckless, willful and wanton disregard for the interests of the Company that his acts were manifestly unfair to the Company and clearly subjected it to the likelihood of loss (c) nor was he thereby guilty of wrongful abstraction of funds of the Company.

2. That the Company did not receive mortgage liens for the proceeds of the aforementioned checks.

3. (a) That the failure to secure such liens was not fraud or dishonesty on the part of R. D. Huffman toward the Company, nor (b) in the failure to secure such liens was R. D. Huffman guilty of such reckless, willful and wanton disregard for the interest of the Company that his acts were manifestly unfair to the Company and clearly subjected it to the likelihood of loss.

4. With respect to other checks totaling $12,500.00 the jury made findings similar to those made regarding the checks totaling $265,000.00.

5. The jury also found that no liens were received for these latter group of checks, but that the failure to secure them was subject to the same findings made with regard to first group of checks and the failure to secure liens therefor.

On this verdict, judgment was rendered that appellants take nothing by their suit.

Appellants in the Court below, in various ways, raised the question, and they present points here to the same effect, that they were entitled to judgment as a matter of law. We agree with appellants, and but for the failure to make Mr. Huffman a party, as the above statute requires, we would render judgment on the bond for appellants.

■ The bond sued upon, being a statutory bond, carries the obligations of the statute requiring it whether or not such obligations are actually contained in the bond itself. Bonds, Sec. 26, 9 Tex.Jur.2d, p. 438.

This statute, Art. 14.08, and hence the bond given to satisfy it, made R. D. Huffman, who had been theretofore duly appointed, the officer of Southern Industrial "responsible in handling the funds of the corporation." The conclusion is inescapable that he, R. D. Huffman, did not, himself, handle the funds of the corporation. He surrendered this responsibility to W. L. Bridges, Jr. In so doing he, in our opinion, committed acts of fraud and dishonesty within the meaning of those words as used in the statute. The resulting pecuniary loss to the Company is undenied.

■ In construing this bond we liberally construe it to effectuate the purpose for

which it is required by statute, the protection of the public interest. Bonds, 9 Tex. Jur.2d, Sec. 25, p. 438.

Judge Simkins, in his work on Contracts and Sales, defines fraud as follows:

"Fraud is an act or concealment involving a breach of legal duty, trust or confidence justly reposed, and from which injury results to another * * *."

This definition of fraud was quoted approvingly in Russell v. Industrial Transportation Co., 113 Tex. 441, 251 S.W. 1034, 258 S.W. 462, 51 A.L.R. 1.

In 50 Am.Jur., Sec. 335, p. 1126, we find this statement of the law:

"A fidelity bond indemnifying against loss by any act of 'fraud or dishonesty' is ordinarily held to extend beyond acts which are criminal; construing the bond most strongly against the insurer, the words are given a broad significance. An act showing want of integrity, a breach of trust, or an abstraction of funds, together with deceit and concealment, may be within the meaning of such a bond. It is not necessary that the employee act for purposes of personal profit."

In 45 C.J.S. Insurance § 802, pp. 852–853, the law is stated to be:

"The terms 'fraud' and 'dishonesty' include any acts which show a want of integrity or a breach of trust."

In 9 Appleman, Ins. Law and Practice, Sec. 5668, p. 513, the law is similarly stated as follows:

"Liability on a fidelity bond covering fraud or dishonesty is not limited to such losses as result from the criminal acts of the employee, but such words have been construed to have a broader meaning and to include any acts which show a want of integrity or a breach of trust."

Appellants cite many cases supporting these statements of the law, but further con-firmation is not deemed appropriate in view of the failure of appellee to cite any truly countervailing authorities. We quote from its brief:

"We respectfully submit that, as used in the statutory fidelity bond made the basis of this suit, acts of 'fraud and dishonesty' on the part of Huffman mean (1) conduct involving moral turpitude or want of integrity, intentionally committed by Huffman with a sense of conscious and willful wrong, or (b) conduct committed by Huffman with such reckless, willful, and wanton disregard for the interests of Southern Industrial that such conduct was manifestly unfair to such company and clearly subjected it to the likelihood of loss. Such meaning of 'fraud and dishonesty' is derived from authorities construing both common law and statutory fidelity bonds and from the legislative history of Article 14.08, Texas Insurance Code."

With respect to Texas cases and Federal Texas cases it states:

"There is a sparsity of Texas cases involving fraud and dishonesty bonds, and not much definitional help is to be found therein. * * *

The same is true of cases from Texas decided by the United States Court of Appeals for the 5th Circuit, * * *."

With respect to out of State authorities appellee states:

"There are numerous cases from other jurisdictions involving fidelity bonds, which declare that for an act to be dishonest or fraudulent there must exist an element of moral turpitude or want of integrity on the part of the bonded person."

Appellee also states:

"For conduct to be dishonest or fraudulent within the meaning of the type of bond made the basis of this suit, it must have been committed with

a sense of conscious and willful wrong. This is implicitly recognized in many of the authorities cited and discussed above and is explicitly stated in such authorities as Sade v. National Surety Corp., 203 F.Supp. 680 (D.C., 1962); Foster v. Bowen, 311 Mass. 359, 41 N.E.2d 181 (1942); and Massachusetts Bonding & Ins. Co. v. Raskin [43 Ga. App. 582], 159 S.E. 778 (Georgia Court of Appeals, 1931). The basis for requiring that the bonded person's conduct be committed with a sense of conscious and willful wrong is twofold. First, from the requirement that to be dishonest or fraudulent the bonded person's conduct must involve moral turpitude or want of integrity, it follows that covered conduct will have been committed with a sense of conscious and willful wrong. Second, from the use of the terms 'fraud' and 'dishonesty' together with 'forgery, theft, embezzlement, wrongful abstraction, and willful misapplication' in Article 14.08 and the statutory bond sued upon herein, it follows that the coverage contemplated was for conduct committed with a conscious and willful sense of wrongdoing."

It is our opinion that the conduct of Mr. Huffman falls clearly within the meaning of fraud as defined by the Texas and other authorities which we have cited. In short, we believe Mr. Huffman breached the trust lawfully reposed in him.

Mr. Huffman could not rationally believe that the money entrusted to him was subject to the unrestricted wishes or desires of W. L. Bridges, Jr. He knew that the primary income of an insurance company was from premiums on policies issued by it. He knew this because he processed the premiums of this company as they were received. Mr. Huffman also knew that this premium money was used to pay claims. He knew this because he paid claims for this company. Mr. Huffman knew that the State, the public, was interested in the monetary matters of Southern Industrial. He

knew this because he made a sworn statement, albeit a false statement, to the State Board of Insurance concerning its financial condition. Hence, Mr. Huffman knew, as any person of average intelligence would know, that it was legally and morally wrong for him to forsake his trust. These authorities so hold:

"If a trustee enters into any arrangement with reference to the trust funds which surrenders or limits his control over them, he is guarantor of the fund, irrespective of his motives, or whether his surrender of control was the cause of the loss." McCollister v. Bishop, 78 Minn. 228, 80 N.W. 1118.

As in case of an administrator, in whom confidence is reposed, his trust duty required him

" * * * 'to take exclusive charge of the personal property * * * and to bring to its administration his own personal attention and judgment. He has no right to allow others to control it * * *. If he does, he exposes it to unnecessary hazards and subjects it to the disposition of persons in whom the officer of the law has reposed no confidence.' * * * such an arrangement is contrary to public policy, * * *." Wood's Estate & Guardianship, 159 Cal. 466, 114 P. 992, 994, 36 L.R.A.,N.S., 252.

"If a person takes upon himself the management of property for the benefit of another, he has no right to impose that duty on others, and if he (delegates discretionary powers with reference to the control and management of the trust property he becomes a guarantor) and is responsible to the cestui que trust, to whom he owes the duty. Therefore, if a trustee confides his duties or the trust fund to the care of a stranger (or to a trust company,) or to his attorney, or even to his cotrustees or coexecutor, he will be personally responsible." Republic Na-

-tional Bank & Trust Co. v. Bruce, 130 Tex. 126, 105 S.W.2d 882.

We are also of the opinion that the conduct of Mr. Huffman falls within the definitions of fraud and dishonesty as appellee would have such terms defined.

In so far as Southern Industrial was concerned, W. L. Bridges, Jr. abstracted $277,500 belonging to it. Mr. Huffman watched him do it. He posted the very checks declared on which showed their diversion to the private account of W. L. Bridges, Jr. He did not close his eyes or turn his back. He facilitated its execution. He covered up its perpetration. This was willful, intentional and constituted moral turpitude.

Appellee has filed six cross-points which we will now consider.

■ Appellee alleged that when this suit was filed all policies of insurance of Southern Industrial, in force, had been reinsured with Southern Fidelity Life Insurance Company; that all creditors and claimants had or could be satisfied without recovery of the amount here sued for; hence, the Receiver had no authority to maintain or prosecute this suit. Appellee stood ready to offer proof of these allegations.

Appellee contends that under Sec. 9(b), Art. 21.28, V.A.C.S., and Guardian Consumer Finance Corp. v. Langdeau, 329 S.W. 2d 926, Austin Civil Appeals, the affairs of Southern Industrial should have been surrendered to Southern Fidelity.

The case cited is not in point. There a stock company was being liquidated and Sec. 9(a), Art. 21.28, was applicable.

Sec. 9(b), Art. 21.28, provides:

"(b) Excess Assets—Other Companies. After the receiver shall have made provision for unclaimed dividends and all of the liabilities of any insurer other than a stock insurance company, he shall dispose of any remaining assets as directed by the receivership court."

The re-insurance contract between the Receiver-Liquidator, Langdeau, and Southern Fidelity Life Insurance Company expressly provided that the claim upon which this suit is based, (unadmitted asset) should be reserved and prosecuted by Mr. Langdeau, in his official capacities. This contract was approved by the receivership court. Hence, Mr. Langdeau, in the prosecution of this suit is acting literally within the provisions of Sec. 9(b), Art. 21.28. Appellees' first cross-point is overruled.

Appellees' fifth and sixth cross-points are that appellants' failure to file proof of loss within the time prescribed in the fidelity bond sued on precludes recovery.

■ This being a suit upon a statutory bond, and the statutes requiring the bond containing no limitation of time for the filing of a claim, it is our opinion that this provision of the bond being more onerous on appellants than authorized by the statutes, that such provision is unenforceable. Bonds, 8 Am.Jur., Sec. 26, p. 717; United States Fidelity Co. v. Poetker, 180 Ind. 255, 102 N.E. 372, L.R.A.1917B, 984; Western Cas. & Guaranty Ins. Co. v. Board of Com'rs, 60 Okl. 140, 159 P. 655, L.R.A. 1917B, 977.

■ The remaining points relate to the absence of Mr. Huffman as a party. As indicated, we sustain these points. Appellants contend that the statute, above quoted, is, in this respect directory only. From a jurisdictional point of view, we would probably agree. Where the point, as here, is raised by the insurer, we believe that the statute should be followed, unless some legal reason be shown for not making the principal a party.

The judgment of the Trial Court is reversed and this cause is remanded with instructions to abate this cause until Mr. R. D. Huffman is made a party or legal excuse for not doing so is established.

Reversed and remanded with instructions.