**GREAT AMERICAN INSURANCE CO.,**
Petitioner,

v.

C. H. LANGDEAU, Receiver of Southern Industrial Life Insurance Co.,
et al., Respondents.

No. A–9810.

Supreme Court of Texas.

May 6, 1964.

Rehearing Denied June 10, 1964.

Brown, Sparks & Erwin, Will G. Barber with firm, Austin, for petitioner.

John R. Grace, Waggoner Carr, Atty. Gen., Dudley D. McCalla, Joe R. Long and Kerns B. Taylor, Asst. Attys. Gen., Austin, for respondents.

GREENHILL, Justice.

This is a suit to recover on a fidelity bond. C. H. Langdeau, the Receiver of Southern Industrial Life Insurance Company and also the Liquidator of that company for the State Board of Insurance, filed this suit against Great American Insurance Company of New York, which is the surety on the bond and which is herein referred to as "the surety company." The bond was issued in accordance with Art. 14.08 of the Texas Insurance Code, to cover the officer responsible for handling the company's funds.[1] Trial was before a jury, and the jury findings were in favor of the surety company. On the fact questions submitted to it, the jury found that the conduct of the bonded employee had not been of the type protected against by the fidelity bond. The Court of Civil Appeals reversed, holding that as a matter of law the acts by the bonded employee constituted that type conduct for which the bond provided protection. 369 S.W.2d 944. The surety company's application for writ of error was granted on the question of whether it was error for the Court of Civil Appeals to hold there was no fact issue for the jury.

Article 14.08 of the Texas Insurance Code provides that a mutual assessment company organized under Chapter 14 shall designate "some officer who shall be responsible in the handling of the funds of the corporation." Under the statute, the company must file for the designated officer a surety bond, "which said bond shall obligate the principal and surety to pay such pecuniary loss as the association shall sustain through acts of fraud, dishonesty, forgery, theft, embezzlement, wrongful abstraction or willful misapplication on the part of such officer, either directly and alone, or in connivance with others, while employed as such officer or exercising powers of such office."

The bond issued by the surety company to cover Ralph Derrell Huffman is an individual fidelity bond. The bond provided for the surety company to pay "the amount of all direct losses, which Ralph Derrell Huffman * * * may, while in any position and at any location in the service of the Employer, directly or by collusion with others, cause to the Employer, including loss of money and other personal property in the Employer's custody or possession, whether or not the Employer is liable therefor, not exceeding, however, the amount of Twenty Thousand Dollars ($20,000.00), through larceny, theft, embezzlement, forgery, misappropriation, wrongful abstraction, wilful misapplication, or any other act of fraud or dishonesty. * * *"

1. All statutory references herein are to Vernon's Annotated Civil Statutes of Texas.

■ In construing fidelity bonds, courts follow the liberal rules applicable to insurance contracts rather than the strict rules of suretyship. Irvin Jacobs & Co. v. Fidelity & Deposit Co., 202 F.2d 794 (7th Cir. 1953). However, the bond cannot be extended by implication, or enlarged by construction, beyond the actual terms of the agreement entered into by the parties. American Surety Co. v. Gracey, Tex.Civ. App., 252 S.W. 263 (1923, no writ).

■ The fidelity bond here provides protection for acts of fraud and dishonesty as well as the other crimes or wrongs above listed. At one time the Texas Legislature had provided for a bond that was broader in coverage. The original legislation was part of the Act that provided for co-operative life insurance companies. It provided coverage for the "faithful performance of duties." Acts 31st Leg., 1st C.S., 1909, sec. 2, p. 287. In 1929, legislation was enacted to regulate local mutual aid associations, and it also provided for a "faithful performance of duties" bond. Acts, 41st Leg., R.S.1929, Sec. 5(5), p. 565. Then in 1933, the Legislature changed the bond to the "fraud and dishonesty" type. Acts, 43d Leg., R.S.1933, sec. 1, p. 577. When the Texas Insurance Code was adopted in 1951, a "faithful performance of duties" bond was required for Chapter 11 mutual life companies. Texas Insurance Code, art. 11.05. However, for Chapter 14 mutual assessment companies, a "fraud and dishonesty" bond was all that was required. Texas Insurance Code, art. 14.08 (as quoted previously). Thus, the bond in the present case does not guarantee a faithful performance of duties. Minor v. Mechanics Bank, 26 U.S. (1 Pet.) 46, 7 L.Ed. 47 (1828); First State Bank v. Metropolitan Casualty Ins. Co., 125 Tex. 113, 79 S.W.2d 835, 98 A.L.R. 1256 (1935). It indemnifies only for crimes or wrongs listed, including fraud and dishonesty. It does not purport to protect against acts of negligence, carelessness, incompetency, or failure to follow instructions. American Surety Co. of New York v. Greek Catholic Union, 284 U.S. 563,

569, 52 S.Ct. 235, 76 L.Ed. 490 (1932); Jellico Grocery Co. v. Sun Indemnity Co. of New York, 272 Ky. 276, 114 S.W.2d 83 (Ky. 1938). The Receiver does not dispute the scope of the bond's coverage. He contends that the conduct of Huffman was fraudulent and dishonest.

■■ To constitute fraudulent and dishonest conduct, the employee must have some degree of intent to perform the wrongful action. There must be the physical act plus the mental state for there to be fraud. Cowan v. Clay County Board of Education, Tex.Civ.App., 41 S.W.2d 513, 515 (1931, wr. ref.). See cases collected in 17A Words and Phrases 69, "Fraud." The intent need not be of the degree required for criminal conduct. Citizens' Trust & Guaranty Co. v. Globe & Rutgers Fire Ins. Co., 4 Cir., 229 F. 326 (1915); Prior Lake State Bank v. National Surety Corp., 248 Minn. 383, 80 N.W.2d 612, 57 A.L.R.2d 1306 (Minn. 1957). On the other hand mere negligence, carelessness or incompetence is insufficient. Irvin Jacobs & Co. v. Fidelity & Deposit Co., 202 F.2d 794 (7th Cir. 1953); Village of Plummer v. Anchor Cas. Co., 240 Minn. 355, 61 N.W.2d 225 (Minn.1953); Salley v. Globe Indemnity Co., 133 S.C. 342, 131 S.E. 616, 43 A.L.R. 971 (S.C.1926); Humbird Cheese Co. v. Fristad, 208 Wis. 283, 242 N.W. 158 (Wis.1932); 50 Am.Jur., Suretyship, §§ 335–338 (1944). If the employee has knowledge of and aids in concealing another person's wrongful conduct, it has been held that he, himself, is guilty of that same wrongful conduct. Shaw v. Cone, Tex.Civ.App., 56 S.W.2d 667, 670 (1933, wr. dism.).

There are Texas cases on fidelity bonds with fact situations bearing some similarity to the instant case. In Austin v. Neiman, 14 S.W.2d 794 (Tex.Comm.App., 1929), the receiver of an insolvent bank sued Neiman, the former bookkeeper and assistant cashier, together with the surety company, for aiding and assisting the bank's president in wrongfully converting the bank's funds. The fidelity bond protected against misap-

plication, wrongful abstraction, and embezzlement.

The evidence showed that every few weeks, Neiman balanced the sum total of individual deposits as shown in the active ledger with the sum total of individual deposits actually in the personal accounts. Since money had been removed from various personal accounts, the ledger would not balance with the actual total of the personal accounts. Neiman denied personal knowledge of the abstraction of funds; but he was the one who personally posted the money when received to the individual ledger, posted the totals to the general ledger, and struck the balance. The Commission of Appeals held it was impossible for Neiman not to have discovered the unlawful abstraction. He kept the books in balance and the only way this could be done was by false entries. Recovery on the bond was allowed.

The Neiman case was followed in Shaw v. Cone, Tex.Civ.App., 56 S.W.2d 667 (1933, wr. dism.). This suit was also brought on a fidelity bond for loss arising from the alleged embezzlement, wrongful abstraction and willful misapplication of the bank's funds by the employee, Cone. Cone manipulated certain books of the bank and customers' passbooks so as to conceal the wrongful acts of the bank's officers. Cone's testimony that he was ignorant that the officers were wrongfully abstracting bank money was disbelieved. Cone's actions of concealment of the missing funds by false book entries showed that he aided and assisted in the wrongful taking.

■ Both the Neiman and the Shaw cases recognized that an intent to do a wrongful act, or knowledge that others were acting wrongfully, was necessary. We concur in that legal test.

In the case before us, the evidence of Huffman's conduct does not conclusively show that he either participated in the wrongdoing or that he had knowledge of the wrongdoing.

The State Insurance Examiners found that over $270,000 of Southern Industrial funds were missing and could not be accounted for. Consequently, in June, 1960, Southern Industrial Company was adjudged delinquent and insolvent, and placed in receivership. The Receiver argues that Huffman, as the principal bonded officer breached his duty by signing checks in blank and by failing to take greater responsibility in the management of the company's investments. Because it is necessary for us to decide whether there was or was not "some evidence" to support the jury's finding that Huffman did not commit any acts of misconduct insured against, the evidence as to Huffman's conduct must be set out in some detail.

### Huffman's Conduct

Huffman first worked in the insurance field during the summer of 1956, when he entered the employment of W. L. Bridges, Jr. Since Huffman was then going to college, this job was only for the summer. In 1958, Huffman graduated, and he approached Bridges about permanent employment. Bridges hired him.

Bridges controlled or operated an extensive network of business enterprises. His holdings included several banks, more than a dozen insurance companies, a land company, a mortgage company, and several other businesses. Most of these companies were operated out of the same office in Dallas, Texas. When Huffman went to work for Bridges, it was not in connection with any one company; rather it was for the Bridges enterprises in general. Huffman's function in the office was to do whatever Bridges asked him to do. This meant that at different times he was working on different companies that Bridges was operating. However, most of Huffman's time was spent with the business of Southern Industrial Life Company.

Huffman's testimony indicates how he spent his time, and of what his work consisted. On a typical day, he began work

by giving the money that had come in the preceding day as premiums on insurance policies to one of the office girls to process. He would take the money out of the safe in the office, where it was kept overnight. Huffman had the combination to the safe. The processing by the office girl consisted of preparing it for deposit in the bank. A deposit slip would be prepared and presented to Huffman for him to make sure it was accurate. Then it was forwarded to Miss Bishop, actuary and accountant for the company, and Huffman's contact with it was finished.

After starting the office girl on the processing of the premium money, Huffman spent almost all of his remaining time on the underwriting and issuing of insurance policies. He worked primarily on the company's group insurance. He would do all of the work to prepare the policy for issuance. For example, if a medical question arose, it was Huffman's responsibility to deal with it. When all of the preparatory work on a policy was completed, he would give the work sheet to a secretary who would prepare the policy and return it to him to check.

Huffman also did the work to prepare claims for payment. Just as with the premium income, a claim that came into the office was turned over to one of the office girls to process. After it was prepared, it would be returned to Huffman whose task it was to make certain the claim was a proper one and that the forms were in proper order. If they were, Huffman would then give the check for payment to Miss Bishop for mailing.

Approximately 95% of Huffman's time was spent on the above, the issuing of new policies, the supervising of the depositing of the premium income, and the verification of the insurance claims.

The remainder of his time was spent on bookkeeping. Huffman did not spend time every day on the bookkeeping. He testified that, depending on the amount of insurance work he had to do, he would do the bookkeeping once a week, or sometimes only once a month. It was his job to do the posting to the company's books. "The balance of my time would be spent doing bookkeeping work, posting checks or check stubs to the disbursement journal, posting income to the income journal, and posting the income and disbursement journals to the general ledger."

There was no discretion or decision-making involved in this bookkeeping work. It was simply a matter of recording on the company books the transactions the company had engaged in. The information and figures to be placed in the books were taken from check stubs or canceled checks.

Huffman's work continued without any significant variation until February, 1959. At that time, Huffman was named to the position of Secretary-Treasurer of two of Bridges' insurance companies, Southern Industrial Life Insurance Company and Rains Service Insurance Company. Huffman continued to perform all of his old tasks; but with his new title, there was one additional job to do. As Secretary-Treasurer, he had the authority to sign company checks and the normal business papers of the company. Just as when he first came to work, the decision that he was to be Secretary-Treasurer was actually Bridges'. Bridges simply stated to Huffman that he was going to be the Secretary-Treasurer:

"Q. Did you occupy a position with them?

"A. I was shown as secretary-treasurer on each of these companies.

" * * *

"Q. Were you also the bonded officer, the principal bonded officer of those two companies?

"A. So I now understand.

" * * *

"Q. How did it come about that you suddenly became Secretary-treasurer of Southern Industrial Life

Insurance Company? Was that discussed with you beforehand?

"A. No, sir; I can't recall the specific instance, other than he [Bridges] just told me that he was making me secretary-treasurer of Southern Industrial Life Insurance Company.

"Q. I see. Did you give him your agreement that you would serve as secretary-treasurer of Southern Industrial?

"A. He was my boss, Mr. Taylor; it was a statement.

"Q. Well, you didn't disagree.

"A. I didn't protest."

The additional tasks did not take up a great deal of his time. Once or twice a week, Bridges would walk in and hand him some papers to sign, and would stand there while Huffman signed them. Sometimes Bridges would leave a stack of business papers on Huffman's desk for him to sign. There would also be checks for him to sign.

Huffman testified that he rarely, if ever, read the documents he was signing. Many of them were legal papers, and he said he had *no reason to read them*. Also, if Bridges was waiting for his signature, he could not stop and read the documents. When signing checks, as well as the business papers, *Huffman rarely knew the purpose for which they were being used*. Most of the time he signed the checks in blank. When the disbursement was to pay a bill, on occasion *he would have the bill in front of him* at the time he signed the check. For other checks, such as those used for investments, he frequently did not have any knowledge of where the check was going. He never made an attempt to see if there were actually papers to support the money being paid out.

Thus the manner of operating these various businesses was to have the checks signed before they went to the desk of the person who filled in the payee and the amount being paid. In the normal course of business, Huffman signed several hundred checks in blank. In this context, Huffman was asked to sign in blank some extra checks and leave them in the checkbook. Huffman testified that the request was made by either Miss Bishop or Bridges who explained that occasionally checks were needed when they worked at night or on weekends when Huffman was not in the office. It was with nine of the checks signed in blank in advance that the missing money was abstracted.

### The Legal Duties of Huffman

■ The Court of Civil Appeals held that, as a matter of law, Huffman was a trustee; and, as a matter of law, his conduct constituted a breach of trust. The Court of Civil Appeals based this conclusion on its analysis of art. 14.08 of the Texas Insurance Code. Under art. 14.08, Huffman was the one "responsible in the handling of the funds of the corporation." To the Court of Civil Appeals, this meant he was responsible not only for receiving the money as it came into the company and for disbursing the funds by signing checks, but also was responsible for investment decisions and all other decisions as to what to spend company money for. The Court of Civil Appeals further concluded that Huffman had the responsibility to see that the money actually was spent for those things shown by company books.

Chapter 14 of the Texas Insurance Code provides the law which governs a mutual assessment insurance company. A mutual assessment insurance company is expressly excepted from the Texas Business Corporations Act by art. 9.14 of the Corporation Act. Thus whatever duties the law requires of an officer of an insurance company is to be found in the Insurance Code. Chapter 14 of the Insurance Code provides in art. 14.04 that the company is to be governed according to a constitution and the by-laws adopted by the members of the association and approved by the State In-

surance Commission. The constitution and by-laws of Southern Industrial Life Insurance Company specify the duties and desponsibilities of its officers:

"Section 1. President. The President shall preside at all meetings, supervise all business of the company, sign checks on the mortuary and general fund, sign all notes and agreements of the company on any loan or advance to the mortuary or general fund (any such loan or advance shall be binding upon the company until repaid in full out of account so designated in agreement made) and may furnish the required bond to the Board of Insurance Commissioners, and sign all policies of membership, keep a record of all records pertaining to the company's business, have full charge of all files and records, unless he so designates this responsibility to another officer of the company at a regular or special meeting of the Board of Directors and the Directors approve the officer of [sic] officers designated." Constitution and by-laws, Art. 8, Sec. 1, as amended in part, January 10, 1955.

"Section 3. Secretary-Treasurer. The Secretary-Treasurer shall sign all policies of membership and keep any and all other records pertaining to the Company, subject to the approval and to be kept as per instructions from the President." Constitution and by-laws, Art. 8, Sec. 3, as amended October 2, 1939.

When the Board of Directors elected Huffman Secretary-Treasurer, they also passed the following resolution:

"Resolved: That R. D. Huffman, Secretary-Treasurer, be, and he hereby is, authorized and empowered to open one or more bank accounts in the name of the company in any bank or banks in Texas that are legal depositories for funds of such companies and to sign such signature cards, checks, resolutions or other instruments of writing as may be required for the normal conduct of business of the Company." Minutes of Special Meeting of the Board of Directors of Southern Industrial Life Insurance Company, February 13, 1959.

Neither the statutes nor the constitution and by-laws of the company expressly establishes the Secretary-Treasurer as a trustee. If, therefore, the Court of Civil Appeals is correct in holding Huffman a trustee, it must be by implication. However, the issue before this Court is not whether a trust was created; rather, the question is whether Huffman's conduct was fraudulent and dishonest. If it was, then the surety is liable on the bond regardless of whether Huffman was a trustee; and if the conduct was not, there can be no recovery on the bond.

On the issues submitted to it, the jury found: that Huffman did not commit an act of fraud or dishonesty upon Southern Industrial Life Insurance Company, either directly and alone, or in connivance with Bridges, in signing certain checks and making them available to Bridges; that Huffman was not guilty of reckless, willful and wanton disregard for the interests of Southern Industrial Life Insurance Company so that his acts were manifestly unfair to the company and clearly subjected it to the likelihood of loss; and that Huffman was not guilty of wrongful abstraction. The jury further found that Southern Industrial Life Insurance Company did not receive mortgage liens purchased with the above checks; that Huffman's failure to secure the mortgage liens for Southern Industrial Life Insurance Company did not constitute fraud and dishonesty on his part toward the company; that Huffman's failure to secure the mortgage liens was not such reckless, willful and wanton disregard for the company's interests so as to be manifestly unfair to the company.

■ While in the Neiman and Shaw cases,[2] the bookkeepers did acts to conceal the missing funds, and with knowledge that funds were missing made false entries in the books, Huffman did not. There is no allegation that false book entries were made. There is no evidence showing that Huffman actually knew money was missing. The evidence is in dispute as to whether he knew what Bridges was doing, and whether he knew there were no mortgages to support the book entries. Since such evidence was in dispute, we think the questions were correctly given to the jury to decide. We therefore hold that the Court of Civil Appeals was in error in holding that as a matter of law the surety company was liable on the bond.

We must now turn to procedural matters in order to determine what disposition of the case this Court must make.

■ After oral argument in this Court, the Receiver filed an amended application for writ of error raising for the first time in this Court cross-points which, if sustained, would require a reversal of judgment of the trial court and a remand for new trial. These points were raised by the Receiver as appellant in the Court of Civil Appeals, but that court did not pass upon them. They were not contained in a motion for rehearing in that court because the Receiver was the prevailing party there.

The surety company objected to the late amendment of the application under the authority of City of Deer Park v. State, 154 Tex. 174, 275 S.W.2d 77 (1955). A majority of this Court is of the opinion that the amendment should be allowed under Rule 481, Texas Rules of Civil Procedure. The distinction seen by the majority is that in Deer Park the amendment was attempted after a judgment had been announced by this Court in that case.

■ We could return this case to the Court of Civil Appeals for it to pass upon these points, and let the points be brought back to us by writ of error. But since they raise only questions of law, we will pass upon them now in the interest of expediting the determination of the case.

■ Most of the Receiver's cross-points deal with the trial court's charge to the jury. The substance of the first two of his points is that the court erred in using the word "guilty" in several of the issues. He argues that the use of the word placed upon him an undue burden of proof, and that it was prejudicial because the word carried a criminal connotation. Thus, the Receiver argues, the use of the word "guilty" erroneously led the jury to believe he had to meet the standard of proof required in a criminal case, and that the conduct in question had to be of a criminal nature for the surety company to be liable on the bond. He further argues that the use of the word "guilty" was unfair because it was calculated to confuse and mislead the jury; that it is a word subject to several meanings, one of which, the criminal connotation, is unfair to his case.

The bond in question which was before the jury did cover several acts, the violation of which would ordinarily result in a person being accused or convicted of a crime. For example, it covered acts of "larceny, theft, embezzlement, forgery * * * wrongful abstraction * * * or any other act of fraud or dishonesty." The Receiver limited his accusations against Huffman to wrongful abstraction, fraud and dishonesty. But he alleged that Huffman willfully exercised no control, was motivated by fraudulent and dishonest intent, and purposely acted in the role of a dummy or tool of Bridges. We have held above that for the surety to be liable on this bond, some intent to commit the wrongful act is necessary; and that it does not cover mere neglect, carelessness, or incompetence.

The issues as submitted did not place upon the Receiver a greater burden of

---

2. Cited on p. 65, supra.

proof than is proper for this type case. The proper standard of proof is "preponderance of the evidence." Each issue submitted to the jury in this case stated this standard of proof. Nowhere was there mentioned any other standard which might have led the jury astray. Thus, on the face of the record, the burden of proof was proper.

The Receiver argues that a stricter standard is contained in the word "guilty." If the charge had asked no more than whether Huffman was "guilty," there might be merit in his argument; but the charge does ask more. As already stated, the standard of proof is explicitly set forth as "preponderance of the evidence."

The word "guilty" is defined in Webster's New International Dictionary (Merriam-Webster, 2d ed. unabridged 1960) as follows:

"Having committed a breach or breaches of conduct; justly chargeable with, or responsible for, a delinquency, crime, or sin; as, a *guilty* man; also, chargeable with, or culpably responsible for, the fault or crime (of); as, *guilty* of bad taste; *guilty* of larceny."

The word, as used in the Bankruptcy Act, is defined by the court in In re Goldberg, 53 F.2d 454, 80 A.L.R. 399 (6th Cir. 1931), as denoting intentional wrongdoing. It was there held applicable to fraudulent misconduct, not criminal in nature (taking or attempting to take a second discharge in bankruptcy within a six-year period). Similarly, Hilkert v. Canning, 58 Ariz. 290, 119 P.2d 233 (Ariz.Sup.1941), the court had before it a statute authorizing the revocation of an accountant's license if he should be found to be "guilty of any act or default discreditable to the profession * *." The court construed this to mean the commission of acts of unprofessional conduct, and it held that the statute was sufficiently definite to support a revocation of a license. The court relied upon that portion of the dictionary definition of "guilty" which gave its meaning as "responsible for a delinquency, crime, or sin."

As a matter of fact, the Texas Insurance Code in its general provisions, Article 21.47, says in effect that any person who shall, with regard to a material fact, knowingly and willingly falsify, conceal or cover up any scheme, or make any false, fictitious or fraudulent statement or representation, shall be fined $5,000, or be imprisoned not more than 5 years, or both. The accusations made by the Receiver of Huffman came very close to stating the substance of this crime.

The Court here was careful to point out what Huffman was accused by the Receiver of doing or failing to do. The word "guilty" does have a recognized meaning which correctly fits the allegations made, and no suggestion was made that the Receiver had to prove his point "beyond a reasonable doubt" as is required for a criminal conviction. In this context, we cannot say that the use of the word was erroneous.

The jury was asked in separate issues whether Huffman did or did not do the acts relied upon by the Receiver as being fraudulent and dishonest, without reference to "guilt." In other issues the jury was asked whether he was guilty of having committed the acts. The jury could have answered that from a preponderance of the evidence, he did do some or all of the acts, without regard to "guilt." It did not do so. It is therefore clear that no prejudice or harm resulted from asking whether, by a preponderance of the evidence, Huffman was guilty of committing the acts alleged against him.

■ The Receiver next argues that Issue No. 1 and similar issues were improperly worded because they did not contain words which would also inquire as to whether Huffman failed to exercise control over funds. The issue as submitted is copied below, with the words desired by the Receiver but omitted by the trial court being italicized:

"Do you find * * * that, in signing the checks * * * and making

them available to W. L. Bridges, Jr., *and in failing thereafter to exercise control over such funds disbursed or property received therefor*, R. D. Huffman committed an act of fraud or dishonesty upon Southern Industrial Life Insurance Co., acting either directly and alone, or in connivance with said Bridges?"

The signing of the checks in blank and making them available to Bridges is one thing, and the failure to exercise proper control over the funds and affairs of the company is another. Thus the included words would have made the issue duplicitous. The jury charge in later issues inquired whether the company received liens *purchased with the checks* and whether Huffman's failure to secure liens was wrongful.

The refusal of the trial court to include the omitted words was not error for the additional reason that it assumes that it was Huffman's duty to exercise "control" over the funds and the property of the company. "Control" is a very broad word. As we have discussed above, the law does not impose upon a person in Huffman's position the duty to control the investment of the company's funds. He was not given "veto" power over acts of the company or its president. Consequently, any fact finding on whether he exercised control or not would not be pertinent to the controlling issues in this cause.

In this connection the trial court instructed the jury as follows:

"You are instructed further that, at all times involved herein, R. D. Huffman was responsible in the handling of the funds of Southern Industrial Life Insurance Company."

■ The Receiver next contends that it was error not to instruct the jury that the policyholders are the owners of a mutual insurance company, and that it is to them, the policyholders, that Huffman was responsible. He argues that the failure to

submit these instructions misled the jury into believing that Bridges had control over the investment of the company's funds. As above stated, the court did instruct the jury that at all times, Huffman "was responsible in the handling of the funds of the company." Whether the company was owned by policyholders or stockholders would not appear to make Huffman's acts right or wrong. The question of whether or not the duties which Huffman owed to the policyholders were breached is pertinent to this lawsuit only insofar as it aids in determining violations of the fidelity bond. The court did include instructions that Huffman was the man legally responsible in the handling of the company's funds. The instructions requested by the Receiver would be proper only if his analysis of the law on the theory of control were correct. The refusal of these instructions was proper.

■ The Receiver next contends that the court erred in its definition of "connivance." The word "connivance" is one of ordinary meaning. It has no peculiar or particular connotation here. Webster's dictionary, supra, defines "connivance" as:

"Corrupt or guilty assent to wrongdoing, not involving actual participation in it, but knowledge of, and failure to prevent or oppose it."

The court's definition of the word in the charge was obviously patterned after the dictionary definition. It was, "A corrupt or guilty agreement or assent to wrongdoing. Such agreement or consent may be active or passive, but the agreement or consent must be with knowledge of the wrongdoing."

The Receiver's requested definition was longer and, in effect, contained examples. It included voluntary oversight; voluntary blindness; secret co-operation to aid and abet; to feign ignorance of; to wink at, or pretend not to know, et cetera. It is our opinion. that the substance of the court's definition was correct and that no harm

resulted from failure to enlarge the definition.

The Receiver has other counterpoints which raise shades and variations of the points heretofore discussed. We have carefully examined them. In view of the length of this opinion, we shall not write further on them. They are overruled.

■ The Receiver next contends that the argument of counsel for the surety company was so unfair and inflammatory that a new trial should be ordered. The entire argument of both parties was transcribed and is before us and has been carefully read. Counsel for the Receiver made no objection to any of the argument complained of, and answered it in the closing argument.

Counsel for the Receiver opened the jury argument by telling the jury that Huffman was responsible to the policyholders and not to Bridges; that Huffman was wholly responsible for the funds; that Huffman's conduct was voluntary blindness. He accused Huffman of leading a double life; that he reminded counsel of "The Great Pretender" and that was just what Huffman was; that all he did was write blank checks. He told the jury that "there is no question * * * but that the company was looted; and how it was looted because Mr. Huffman went along with his blind, willful, utter disregard for the interests of everybody but Mr. Bridges." "We say there was wrongful abstraction because Huffman knew what he was doing; he knew these monies were being diverted over into Mr. Bridges' private companies." The "looting" charge was repeated.

In its argument, the first counsel for the surety answered the "looting" charge. He argued that there was nothing to convict this man of fraud and dishonesty. Most of the opening argument for the surety was directed toward stating that there were no acts of fraud and dishonesty on the part of Huffman; that Huffman never got anything out of the company himself; that the

Receiver's case was built on circumstantial evidence; and that the wrongs were based upon what Huffman "should have known," rather than what he actually knew. Counsel then stated, "Where are the fingerprints of Huffman as a thief?"

The second attorney to argue for the surety company made the statements of which the Receiver complains most strongly. After referring to the "looting" charge, counsel said, "In all of this investigation, what have they got to show to connect this young man with being a crook, a thief, or an embezzler?" He then discussed the evidence; and concluded, apparently in sarcasm, "That [evidence] makes him a crook and an embezzler and knowing all about this crooked looting of these insurance companies." This counsel finished by saying, "The burden of proof is on them to show that this man had a willful disregard of the law and was dishonest"; and that the Receiver did not sustain the burden of proof to show that "this man is a thief, an abstractor of funds, and that he willfully and intentionally failed to do these things that the Court asks you about." As stated above, there were no objections to any of this argument.

The closing argument for the Receiver stated that the bond in question was not just a Justice of the Peace bond; that it was not a bond in which the jury would have to find that Huffman was a thief or an embezzler. "You are shown in your charges what to find. And if from the evidence you think that what has been presented meets that standard, all three of them, or anyone of the three, we think it should be entered in the affirmative."

We cannot say that considering the argument as a whole, read in the light of the record in the case, it was such as to cause a rendition of an improper verdict. The Receiver relies on this Court's opinion in Southwestern Greyhound Lines v. Dickson, 149 Tex. 599, 236 S.W.2d 115 (1951). In the Dickson case there were two separate elements of improper jury

argument. In the first, counsel for the plaintiff in answering the defendant's opening argument, asked if his client (the plaintiff) was a liar, a cheat, or a fraud; that he did not think she was any of those, or a faker, or an impostor. The argument was objected to on the ground that the defendant had not called her any of those things. The objection was overruled. This Court said the objection should have been sustained. The second part of the argument was more inflammatory. It accused the defendant's doctor of being a "cutting doctor" who was "influenced by a desire for whittling flesh"; that he "socked" the plaintiff $350 for just taking some stitches in her knee. Plaintiff's counsel stated that the defendant's doctor ought to be getting a part of the defendant's attorneys' fees because he was such an advocate; and that the doctor reminded counsel of the story about the fisherman who said to the fish, "Lay still! I ain't going to do nothin' to you except cut your guts out." Counsel for the plaintiff further referred to the defendant and its lawyers as a bunch of cattle. This Court said the arguments were improper, and taken together, they probably did cause the rendition of an improper verdict. We regard the Dickson case as being clearly distinguishable.

■ Finally, there is a procedural problem. The Court of Civil Appeals, in holding as a matter of law for the Receiver, has in effect held there is no evidence to support the fact findings of the jury. In this, we have held it erred. A decision by a Court of Civil Appeals that there is "no evidence" to support fact findings includes, by necessary implication, a holding that the evidence is insufficient to support such fact findings, or that the findings of the jury are against the great weight and preponderance of the evidence. Barker v. Coastal Builders, 153 Tex. 540, 271 S.W.2d 798, 807 (1954); Calvert, Some Problems of Supreme Court Review, 21 Texas Bar Journal 75 (1958). Under these circumstances, instead of sending the case back to the Court of Civil Appeals for it

to pass upon questions of the sufficiency or the "weight and preponderance" of the evidence we remand the case directly to the trial court for a new trial. Barker v. Coastal Builders, supra. But, for this Court to so remand, there must be proper points presented in the briefs in the Court of Civil Appeals raising the questions of "insufficiency" and "weight and preponderance."

There were no such proper points in this case, and the rule above referred to is not applicable here.

■ The only point in the Receiver's brief in the Court of Civil Appeals attacking the weight and preponderance of the evidence or the sufficiency of the evidence was his Point 13. That point reads:

"The [trial] court erred in refusing to set aside the verdict of the jury because the verdict on the special issues was so contrary to the overwhelming weight of all the evidence as to be clearly wrong and unjust."

This point did not attack the sufficiency of the evidence to support a particular issue or the weight and preponderance of the evidence as to any issue. It was, rather, an attack at the entire jury verdict. This Court has held that such a general assignment will not support a reversal. Texas Employers Ins. Ass'n v. Hawkins, 369 S.W.2d 305 (Tex.1963). A basis of the ruling is that the Court of Civil Appeals itself must decide that a specific issue or issues are not supported by sufficient evidence or that they are against the great weight and preponderance of the evidence. Parrish v. Hunt, 160 Tex. 378, 331 S.W.2d 304 (1960).

The Receiver attempted unsuccessfully to supply specific points by amendment. Rule 431, Texas Rules of Civil Procedure, dealing with the Courts of Civil Appeals, says:

"Briefs may be amended or supplemented at any time when justice requires upon such reasonable terms as the court may prescribe * * *"

The Receiver presented to the clerk of that court a motion for leave to amend his brief and to add therein the proper points on "insufficiency" and "weight and preponderance." The motion for leave to amend and the amendment (the points themselves) are all under the same cover. This combined document bears the file mark of the clerk of that court. If that were all, it might be presumed (though it is unnecessary to decide) that the court had granted leave to file and that it had considered the new points. But that court has written an opinion which affirmatively shows that it did not act on the motion. The unpublished opinion reads:

"Appellants have filed a motion in this Court requesting that our records be corrected to show that their motion filed herein on June 17, 1963, to amend their brief was granted. Writ of error has been granted in this cause and it is now pending in our Supreme Court.

"We have jurisdiction and authority, and it is our duty, to correct or amend our records at any time in order that they may speak the truth. The truth here, however, is that appellants' motion to amend their brief was never overtly acted on by this Court. We will say that had such motion been formally determined, we would have granted it. We would do so now had we the authority.

"Whether or not our silence regarding this motion, under the circumstances related by appellant, is the equivalent of granting it is, we believe, now a question for decision by the Supreme Court.

"The motion is overruled."

This must mean that the Court of Civil Appeals did not act upon, and hence did not grant, the leave to amend.

 In the trial court, the surety company contended that Huffman was a necessary party and that it was error to proceed to trial without his being made a party. In this Court, the Receiver has submitted a conditional application contending that the Court of Civil Appeals erred in sustaining the surety company's point that Huffman must be joined as a party. The surety company's argument in this Court is that the Court of Civil Appeals erred in not dismissing the suit for failure to join Huffman as a party. Since this Court is reversing the Court of Civil Appeals and affirming the judgment of the trial court in favor of the surety company on other grounds, it is not necessary to resolve this point. The outcome of the present case does not affect the rights of Huffman, and it does not prejudice the right of the Receiver to file a separate lawsuit against Huffman, personally, if he so desires.

The judgment of the Court of Civil Appeals is reversed and that of the trial court is affirmed.

GRIFFIN and SMITH, JJ., dissenting.

SMITH, Justice.

I respectfully dissent. In my opinion, Huffman committed acts of "fraud and dishonesty" within the meaning of those terms as used in Article 14.08, Texas Insurance Code, and the surety company is accordingly liable on its fidelity bond.

I fully recognize that the bond in question does not "guarantee a faithful performance of duties." Furthermore, as the majority opinion notes, it is elementary that the bond "indemnifies only for crimes or wrongs listed * * *." Among the listed wrongs, for which protection is provided, are acts of fraud and dishonesty.

The surety company has contended throughout the trial of this cause that the terms "fraud and dishonesty" are limited to include only conduct involving moral turpitude or want of integrity on the part of the bonded employee committed by him with a sense of consciousness and willful wrong. In the alternative, the surety company has

contended these terms cover only conduct committed with such reckless, willful and wanton disregard for the interests of his employer that such conduct was manifestly unfair to the employer and clearly subjected it to the likelihood of loss.

On the other hand, respondents contend that the terms "fraud" and "dishonesty" as applied to coverage under a bond of fidelity insurance given by the bonding company pursuant to the provisions of Article 14.08, include not only those elements contended for by the surety company, but include acts and conduct the nature of which shows a want of integrity or *a breach of trust.*

This court has held that to constitute fraudulent and dishonest conduct, within the meaning of the bond, Huffman must have had "some degree of intent to perform the wrongful action. There must be the physical act plus the mental state for there to be fraud." The majority opinion further states that " * * * an intent to do a wrongful act, or knowledge that others were acting wrongfully" is necessary. The majority then concludes that the jury findings in favor of the surety company must be upheld since " * * * the evidence of Huffman's conduct does not conclusively show that he either participated in the wrongdoing or that he had knowledge of the wrongdoing."

First, assuming that this court has applied the correct test as to what constitutes "fraudulent and dishonest" acts within the meaning of the bond, Huffman's conduct falls within the majority's definition. The evidence clearly shows that Huffman posted the very checks declared on which showed their diversion to the private account of W. L. Bridges, Jr.

There is a more basic reason, however, why I cannot agree with the majority. Prior to this cause, the terms "fraud" and "dishonesty," *as used in conjunction with the extent of coverage of a fidelity bond,* had not been definitively interpreted. This being so, this court should liberally construe the terms in order to effectuate the

purpose for which the Legislature has required that such a bond be posted; e. g., *the protection of the public interest.* In my opinion, the *narrow* definition adopted by the majority does not carry out this purpose but, to the contrary, renders Article 14.08 meaningless and makes inoperative the bond in question.

Under the provisions of Article 14.08, the Legislature has directed that some officer "shall be *responsible* in the handling of the funds of the corporation." In the present case, Huffman was appointed to, and accepted, this responsibility placed upon him by the Statute. At this point, any attempt to comply with the legislative mandate ceased. By his own testimony, Huffman admitted that he voluntarily and completely surrendered all control of handling the corporation's funds:

"Q Now, having taken over as secretary-treasurer and bonded officer of Southern Industrial Life Insurance Company, did you have occasion to write some checks from time to time in that company?

"A Yes, sir.

"Q Did you write all or most of the checks in that company?

"A No, sir. I signed most of the checks.

"Q How did you sign them?

"A I signed checks in blank in most instances. Possibly some bills I had before me; I paid them with the bill in front of me.

* * * * * *

"Q Did you ever look to see the source of these expenditures resulting from the blank checks that you signed—

"A No, sir, other than—

"Q —to see where the money was going?

"A No, sir, other than casually looking at a check, while I was signing it, maybe, sometime.

"Q And did you ever bother to see whether any papers were executed to support these disbursements, the blank checks that you were signing?

"A No, sir; Mr. Bridges handled all the paper work, the legal documents, the processing of all investments.

"Q You never did bother to check on that?

"A No, sir.

\* \* \* \* \* \*

"Q Did you see any of the mortgage loan papers in the office there, supporting those purported mortgage loans, for the year 1959 for Southern Industrial?

"A No, sir. As I said, Mr. Bridges handled the investments and all the necessary legal documents.

\* \* \* \* \* \*

"Q Did you attempt to make an investigation whatever of the financial affairs or bookeeping of Southern Industrial Life Insurance Company while you were the secretary-treasurer and principal bonded officer of the company?

"A No, sir.

"Q Did you exercise any care whatever in seeing that the money that was disbursed went for authorized investment purposes under the Insurance Code?

"A I only made disbursements when I was instructed to by Mr. Bridges. As far as checking on any of those disbursements, I did not.

"Q Well, did you exercise any degree of care or responsibility with ref-

erence to determining whether the disbursements were for authorized purposes and were proper?

"A No, sir; since Mr. Bridges handled that, he took care of it.

"Q Did you ever make any attempt to recapture any of the money that went out of the company on these blank checks which you said you signed, where it went for purposes other than the insurance company, Southern Industrial?

"A Did I personally make any attempt to recover?

"Q Yes.

"A No.

"Q Did you ask anybody in the company or any of the officers or directors to make any attempt?

"A No, sir.

"Q Did you ever call to the attention of any of the officers or directors of Southern Industrial Life Insurance Company any irregularities, or the fact that you were signing all the checks in blank?

"A No, sir, I was not aware of any irregularities, either in signing checks in blank, or in anything else."

It is clear that as a direct result of this haphazard, loose manner of handling the funds, the corporation "expended" $277,500.00 for which it received *nothing* in return. Yet, the majority says that the surety company is not liable on its bond because the conduct of Huffman was not fraudulent and dishonest.

By directing that some officer be *responsible* for handling corporate funds, I do not believe the Legislature intended to permit a person in Huffman's position to handle the funds in *any* manner, so long as he acted with a pure heart. As stated in McFar-

land v. George, Mo.App., (1958) 316 S.W. 2d 662, 671:

" * * * The primary meaning of 'responsibility' as found in the dictionaries is the state of being answerable for an obligation. * * * The term 'responsibility' includes judgment, skill, ability and capacity. Ohio Power Co. v. N. L. R. B., 6 Cir., 176 F.2d 385, 387 [11 A.L.R.2d 243]. Legal responsibility is the state of one who is bound or obliged in law and justice to do something. Behnke v. New Jersey Highway Authority, 13 N.J. 14, 97 A.2d 647, 654. In Crockett v. Village of Barre, 66 Vt. 269, 29 A. 147, the court said: 'One's duty is what one is bound or under obligation to do. One's responsibility is its liability, obligation, bounden duty.' The word 'responsibility' as used in the rule *means the doing of something. Any other meaning would render the rule meaningless.*" (Emphasis added.)

In my opinion, the Legislature clearly intended for a person in Huffman's position to *at least* be responsible for seeing that corporate funds were actually being spent for those things shown on the company books: without such a minimum requirement, Article 14.08 is meaningless.

In his work on Contracts and Sales, Judge Simkins has defined "fraud" as follows:

"Fraud is an act or concealment involving a breach of legal duty, *trust* or confidence justly reposed, and from which injury results to another. * * * *"

This court has quoted the above definition with approval. See Russell v. Industrial Transportation Co., 113 Tex. 441, 251 S.W. 1034, aff. 258 S.W. 462, 51 A.L.R. 1 (1924).

The following general rule is set forth in 9 Appleman, Ins. Law and Practice, Sec. 5668, p. 513:

"Liability on a fidelity bond covering fraud or dishonesty is not limited to such losses as result from the criminal acts of the employee, but such words have been construed to have a broader meaning and to include any acts which show a want of integrity or a breach of trust."

I am in full accord with the Court of Civil Appeals' holding that, under the provisions of Article 14.08, Huffman was a trustee of the corporate funds. Furthermore, under my construction of the statute, his conduct amounted to a breach of trust as a matter of law. Therefore, he committed acts of fraud and dishonesty within the meaning of those terms as used in the statute; and, accordingly, the surety company is liable on its fidelity bond.

Even assuming that the majority is correct that "the Court of Civil Appeals was in error in holding that as a matter of law the surety company was liable on the bond," I cannot agree with the judgment entered by this court. In my opinion, there were proper points presented in the Court of Civil Appeals raising the question of "insufficiency" and "weight and preponderance." Thus, this cause should be remanded to the trial court for a new trial.

On June 17, 1963, prior to oral argument in the Court of Civil Appeals, appellant Langdeau filed a motion to amend his brief, together with an amended brief, in that court. This amended brief contained points on "insufficiency" and "weight and preponderance." On the same day, a copy of the motion and the amended brief was delivered to counsel for the appellee surety company. Prior to filing his motion, appellant's counsel was informed by one of the Court of Civil Appeals' justices that it was not necessary that the Court enter any formal order granting the motion to amend, and that the Court considered such briefs as were before it on the date of oral submission.

During oral argument of the case, appellant's counsel made reference to the amended brief stating that he assumed such brief would be considered by the Court and that

such points as were raised in such brief were properly before the Court for consideration.

Although duly notified of the filing of said amended brief, counsel for appellee did not contest same by written motion nor did he contest the filing of such brief for consideration thereof by the Court during oral argument before the Court.

Notwithstanding the above, this court now holds that appellant failed to present proper points in his briefs in the Court of Civil Appeals raising the questions of "insufficiency" and "weight and preponderance."

Rules of procedure should be interpreted liberally in order to promote justice, rather than to be utilized as a trap for the unwary to thwart justice. Since the Court of Civil Appeals sustained appellant's no evidence points, it was not necessary for that court to *formally* determine appellant's motion to amend or amended brief, wherein the jury answers to each special issue were properly attacked by points raising weight and preponderance of evidence questions.

It was not the fault of appellant that the Court of Civil Appeals did not *formally* grant his motion to amend, and appellant should not, in justice, be penalized for such lack of action by the court.

It is necessary to discuss one other holding in order to understand the judgment I believe should be entered in this cause. In the trial court and the Court of Civil Appeals, the surety company contended that Huffman was a necessary party to the suit. The Court of Civil Appeals sustained this contention and therefore reversed and *remanded* with instructions to abate the cause "until Mr. Huffman is made a party or legal excuse for not doing so is established." I do not agree that Huffman was a necessary party, and therefore the Court of Civil Appeals should have *rendered* judgment on the bond against the surety company.

The judgment of the Court of Civil Appeals should be affirmed in part and reversed in part. In the alternative, the judgment of the Court of Civil Appeals should be reversed and the cause remanded to the trial court for a new trial.

GRIFFIN, J., joins in this dissent.